# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-30247

United States Court of Appeals
Fifth Circuit

**FILED**
May 18, 2021

Lyle W. Cayce
Clerk

GREGORY V. TUCKER,

      Plaintiff – Appellee

v.

CITY OF SHREVEPORT; C. B. CISCO; T. KOLB; W. MCINTIRE; Y. JOHNSON,

      Defendants – Appellants

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 5:17-CV-1485

Before CLEMENT, HIGGINSON, and ENGELHARDT, Circuit Judges.

KURT D. ENGELHARDT, Circuit Judge.

Alleging that members of the Shreveport, Louisiana Police Department employed excessive force in effecting his November 30, 2016 arrest, Plaintiff–Appellee Gregory V. Tucker ("Tucker") filed suit under 42 U.S.C. § 1983 against Defendant–Appellants Chandler Cisco, William McIntire, Yondarius Johnson, Tyler Kolb (collectively, "Defendant Officers"), and the City of Shreveport. Specifically, Tucker maintains that the police officers' conduct—forcing him to the ground and then beating him in order to place him in handcuffs—violated his rights protected by federal and state constitutional law, as well as Louisiana tort law. Upon Defendant–Appellants' motion, the district court granted summary judgment in favor of Defendant Officers in their official capacities on all claims. The district court denied summary

No. 19-30247

judgment, however, as to all of Tucker's claims against the City of Shreveport, as well as his § 1983 and Louisiana law claims against Defendant Officers in their individual capacities. Contending that the district court erred in concluding that fact issues preclude dismissal on qualified immunity grounds, Defendant Officers filed this interlocutory appeal. As stated herein, we REVERSE and REMAND.

## I.

Given the interlocutory and limited nature of this appeal, we lack jurisdiction to review the district court's "sufficiency of the evidence" assessments of disputed facts. *See, e.g., Cole v. Carson*, 935 F.3d 444, 452 (5th Cir. 2019) (quotation omitted), *as revised* (Aug. 21, 2019), *cert. denied sub nom. Hunter v. Cole,* 141 S. Ct. 111 (2020). Rather, we focus solely on "examining the materiality of factual disputes the district court determined were genuine," that is, our review is limited to determining "the legal significance of the conduct . . . deemed sufficiently supported for purposes of summary judgment." *Id.* (internal quotations omitted). "An officer challenges materiality [by contending] that taking *all* the plaintiff's factual allegations as true[,] no violation of a clearly established right was shown." *Arizmendi v. Gabbert*, 919 F.3d 891, 896 (5th Cir.), *cert. denied*, 140 S. Ct. 220 (2019) (quoting *Winfrey v. Pikett,* 872 F.3d 640, 643–44 (5th Cir. 2017)). Nevertheless, because there is video and audio recording of the event, we are not required to accept factual allegations that are "blatantly contradicted by the record." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Rather, we should "view[ ] the facts in the light depicted by the videotape." *Id.* at 381.

Our review of the district court's rulings is greatly assisted by the lengthy "Memorandum Ruling" prepared by the district judge, reflecting a painstaking account of the encounter between Tucker and Defendant Officers,

No. 19-30247

as portrayed in the four video and audio recordings taken by the police officers' vehicle cameras, Defendant Officers' offense reports, Tucker's complaint, and the parties' deposition testimony.[1]  Indeed, for the most part, we agree with the district court's factual account, including that there are "two distinct moments of force" that must be separately analyzed:  (1) [Officers] McIntire and Cisco taking Tucker to the ground, and (2) Defendant Officers punching and kicking him while he was on the ground.[2]  It is only with respect to the legal significance of those facts where we ultimately part ways with the district court.

## II.

For purposes of liability under 42 U.S.C. § 1983, excessive force claims arising from an arrest or investigatory stop invoke the protection provided by the Fourth Amendment of the United States Constitution against "unreasonable seizure." Fourth Amendment jurisprudence, however, has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat

---

[1]  *See* February 27, 2019 Mem. Ruling. Three of the four videos contain pertinent footage, which is available at:

https://www.ca5.uscourts.gov/opinions/pub/19/19-32047_OfcChandler-full.mp4 ("Chandler Video");

https://www.ca5.uscourts.gov/opinions/pub/19/19-30247_OfcMcIntire-full.mp4; ("McIntire Video"); and

https://www.ca5.uscourts.gov/opinions/pub/19/19-30247_OfcKolb-full.mp4 ("Kolb Video").

[2]  Having the benefit of the district court's detailed February 27, 2019 written ruling in the appeal record, we find it unnecessary to duplicate the work of the district court by embarking upon a lengthy and comprehensive recitation of facts in this opinion.  Having ourselves viewed and listened to the video and audio recordings numerous times, struggling to ascertain the exact course of the often chaotic events as they unfolded, second by second, and frame by frame—despite the unfortunately unhelpful angles of the cameras and the blinding glare of the constantly flashing lights of the police vehicles—the substantial time and effort likewise expended by the district court is obvious from the detailed nature of its factual accounting.

3

thereof to effect it. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Thus, determining whether the force used to effect a particular seizure is "reasonable" for purposes of the Fourth Amendment requires a careful balancing of the intrusion upon the individual's interests with the countervailing governmental interests at stake. Regarding that analysis, the Supreme Court, in *Graham,* 490 U.S. at 396, provided the following guidance:

> Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Bell v. Wolfish*, 441 U.S. 520, 559 (1979), [] its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

Importantly, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* Thus, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Id.* (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir. 1973)). Instead, "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. Although all disputed facts are construed in favor of the non-movant in the summary judgment context, evaluating the reasonableness of an officer's use of force requires consideration of how a reasonable officer would have perceived those facts. *Griggs v. Brewer,* 841 F.3d 308, 313–14 (5th Cir. 2016).

"As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and

No. 19-30247

circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.*

## III.

The doctrine of qualified immunity protects public officials from suit and liability for damages under § 1983 unless their conduct violates a clearly established constitutional right. *Mace v. City of Palestine,* 333 F.3d 621, 623 (5th Cir. 2003). Thus, in determining qualified immunity, courts engage in a two-step analysis: (1) was a statutory or constitutional right violated on the facts alleged; and (2) did the defendant's actions violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Id.* at 623–24. The two steps of the qualified immunity inquiry may be performed in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

In excessive force cases, "[t]he second prong of the [qualified immunity] analysis 'is [itself] better understood as [encompassing] two separate inquiries: whether the allegedly violated constitutional rights were clearly established at the time of the incident; and, if so, whether the conduct of the defendants was objectively unreasonable in light of that then clearly established law.'" *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005) (quoting *Felton v. Polles*, 315 F.3d 470, 477 (5th Cir. 2002)). An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard,* 572 U.S. 765, 778–79 (2014). "If officers of reasonable competence could disagree as to whether the plaintiff's

5

rights were violated, the officer's qualified immunity remains intact." *Tarver,* 410 F.3d at 750.[3]

"Whether an official's conduct was objectively reasonable [in light of the law that was clearly established at the time of the disputed action] is a question of law for the court, not a matter of fact for the jury." *Brown v. Callahan,* 623 F.3d 249, 253 (5th Cir. 2010). But, "in certain circumstances where 'there remain disputed issues of material fact relative to immunity, the jury, properly instructed, may decide the question.'" *Mesa v. Prejean,* 543 F.3d 264, 269 (5th Cir. 2008) (quoting *Presley v. City of Benbrook,* 4 F.3d 405, 410 (5th Cir. 1993)); *McCoy v. Hernandez,* 203 F.3d 371, 376 (5th Cir. 2000) (if the court has not decided the issue prior to trial, "the jury . . . determine[s] the objective legal reasonableness of the officers' conduct").

"A qualified immunity defense alters the usual summary judgment burden of proof." *Brown,* 623 F.3d at 253. Although nominally an affirmative defense, the plaintiff has the burden to negate the defense once it is properly raised. *Garza v. Briones,* 943 F.3d 740, 744 (5th Cir. 2019). The plaintiff has the burden to point out clearly established law. *Clarkston v. White,* 943 F.3d 988, 993 (5th Cir. 2019). The plaintiff also bears the burden of "raising a fact issue as to its violation." *Delaughter v. Woodall,* 909 F.3d 130, 139 (5th Cir. 2018)). Thus, once the defense is invoked, "[t]he plaintiff must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct" according to that law. *Gates v. Texas Dep't of Protective & Regul. Servs.,* 537 F.3d 404, 419 (5th Cir. 2008).

---

[3] Thus, in the excessive force context, "[t]he term 'objective reasonableness' pertains independently to the determination of a constitutional violation and also to the immunity issue." *Mason v. Faul,* 929 F.3d 762, 765–66 (5th Cir. 2019), *cert. denied,* 141 S. Ct. 116 (2020).

No. 19-30247

At the summary judgment stage, however, all inferences are still drawn in the plaintiff's favor. *Brown,* 623 F.3d at 253. This is true "even when . . . a court decides only the clearly-established prong of the [qualified immunity] standard." *Tolan v. Cotton,* 572 U.S. 650, 657 (2014). Likewise, "under either [qualified immunity] prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* at 656. "Accordingly, courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Id.* at 657; *see, e.g., Tarver,* 410 F.3d at 754 (dismissal at summary judgment phase inappropriate because determining whether officer's conduct was objectively unreasonable in light of clearly established law required factfinding and credibility assessments).

When evaluating a qualified immunity defense, courts "consider[] only the facts that were knowable to the defendant officers." *White v. Pauly*, 137 S. Ct. 548, 550 (2017) (per curiam); *see also Cole*, 935 F.3d at 456 ("[W]e consider only what the officers knew at the time of their challenged conduct."). "Facts [that] an officer learns after the incident ends—whether those facts would support granting immunity or denying it—are not relevant." *Hernandez v. Mesa,* 137 S. Ct. 2003, 2007 (2017) (per curiam); *Brown*, 623 F.3d at 253 ("An official's actions must be judged in light of the circumstances that confronted him, without the benefit of hindsight.").

"Because the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). "Clearly established law is determined by controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Clarkston,* 943 F.3d at 993 (quoting *Delaughter*, 909 F.3d at 139).

No. 19-30247

With qualified immunity, the Supreme Court has repeatedly instructed that clearly established law is *not* to be defined at a high level of generality. This is particularly true in recent years. *See, e.g., City of Escondido v. Emmons,* 139 S. Ct. 500, 503–04 (2019); *Kisela v. Hughes,* 138 S. Ct. 1148, 1152–53 (2018); *Mullenix v. Luna,* 577 U.S. 7, 12–14 (2015). For conduct to be objectively unreasonable in light of clearly established law, there need not be a case directly on point, but "existing precedent must have placed the statutory or constitutional question beyond debate." *White,* 137 S. Ct. at 551 (per curiam) (internal quotation marks omitted); *Mullenix,* 577 U.S. at 14.[4]

"[S]pecificity is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela,* 138 S. Ct. at 1152–53 (quoting *Mullenix,* 577 U.S. at 12). "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Id.* at 1153 (internal quotation marks omitted). "Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers . . ., but in the light of pre-existing law, the unlawfulness must be apparent." *White,* 137 S. Ct. at 552 (internal quotation marks omitted). Thus, the general rules set forth in "[*Tennessee v. Garner,* 471 U.S. 1 (1985)], and *Graham* do not by themselves

---

[4] "Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness." *Kisela,* 138 S. Ct. at 1153.

create clearly established law outside 'an obvious case.'" *Id.* (quoting *Brosseau*, 543 U.S. at 199).

Sufficiently specific "[p]recedent involving similar facts can help move a case beyond the otherwise hazy border between excessive and acceptable force and thereby provide an officer notice that a specific use of force is unlawful." *Kisela*, 138 S. Ct. at 1153 (internal quotation marks omitted). Otherwise, "qualified immunity protects actions in the hazy border between excessive and acceptable force." *Mullenix*, 577 U.S. at 18 (internal quotation marks omitted). Thus, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). It likewise "shields an officer from suit when [the officer] makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [the officer] confronted." *Brosseau*, 543 U.S. at 198; *see also Saucier v. Katz,* 533 U.S. 194, 205 (2001) ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct."). In short, "[w]hen properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted).

Consequently, "[q]ualified immunity is justified unless *no* reasonable officer could have acted as [the defendant officers] did here, or *every* reasonable officer faced with the same facts would *not* have [acted as the defendant officers did]." *Mason v. Faul*, 929 F.3d 762, 764 (5th Cir. 2019), *cert. denied,* 141 S. Ct. 116 (2020) (citing *District of Columbia v. Wesby,* 138 S. Ct. 577, 590 (2018) ("The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. [] Otherwise, the rule is not one that 'every reasonable official' would know.")).

No. 19-30247

IV.

As previously stated, we agree with the district court that "two distinct moments of force must be separately analyzed: [(1)] [Officers] McIntire and Cisco taking Tucker to the ground, and [(2)] Defendant Officers punching and kicking him as he lay on the ground." With each, the district court concluded that a reasonable jury could find that Defendant Officers acted unreasonably such that Tucker's Fourth Amendment rights were violated and, moreover, that Defendant Officers were not entitled to qualified immunity. Putting aside the question of whether Defendant Officers acted unreasonably for purposes of establishing a Fourth Amendment violation, we disagree with the district court's determinations relative to qualified immunity.

A. Takedown

Regarding the force utilized in the course of Tucker's takedown, the district court concluded, in pertinent part:[5]

> Here, Tucker had not been told that he was under arrest and had complied (in his version of the facts) with the request to place his hands behind his back. McIntire gave no verbal commands before, mere seconds after arriving on the scene, pulling Tucker down to the ground. In light of Tucker's verbal objections and the discovery of a knife in his pocket, McIntire and Cisco would have been justified in using some force to place Tucker in handcuffs had he refused to cooperate in allowing them to be placed. However, the immediate resort to a takedown maneuver was not necessarily a measured and ascending response to the need to place handcuffs on a non-struggling Tucker without first articulating that he was under arrest and giving him a reasonable opportunity to allow himself to be handcuffed. As a result, viewing the facts in the light

---

[5] *See* February 27, 2019 Mem. Ruling at 19–21.

10

most favorable to Tucker, a jury could find that Cisco and McIntire had acted unreasonably.

Although fact questions prevent granting summary judgment on the question of whether Cisco and McIntire violated Tucker's Fourth Amendment rights, the two officers may still be released from suit on this claim if they are entitled to qualified immunity. To defeat qualified immunity, Tucker must point to a case holding that officers acting in similar ways under similar circumstances violated a suspect's right to be free from excessive force. *White,* 137 S. Ct. at 552.

As of 2013, it was clearly established that "violently slam[ming] an arrestee who is not actively resisting arrest" is a constitutional violation. *Darden* [*v. City of Fort Worth,* 880 F.3d 722, 731 (5th Cir. 2017)] (citing [*Ramirez v. Martinez,* 716 F. 3d 369, 377–78 (5th Cir. 2013)]; *Newman v. Guedry,* 703 F.3d 757, 762–63 (5th Cir. 2012); *Bush v. Strain,* 513 F.3d 492, 501 (5th Cir. 2008)). Passive resistance does not authorize violent force on an officer's part. [*Deville v. Marcantel,* 567 F.3d 156, 167–68 (5th Cir. 2009)]. As a result, the Fifth Circuit has repeatedly denied qualified immunity in cases in which "officers face verbal resistance but no fleeing suspect." *Bone v. Dunnaway,* 657 F. App'x 258, 263 (5th Cir. 2016) (per curiam) (citing *Deville,* 567 F.3d at 169; *Bush,* 513 F.3d at 502; *Goodson v. City of Corpus Christi,* 202 F.3d 730, 734, 740 (5th Cir. 2000)). Even though Tucker was offering some degree of verbal resistance, in the absence of overt physical resistance to being handcuffed, flight or the prospect of flight, and instructions or warnings beyond one request to place his hands behind his back, forcefully pulling Tucker to the ground such that his face struck the concrete would have violated clearly established law. Therefore, McIntire and Cisco are not entitled to qualified immunity for the force used in the takedown.

After watching the video footage of McIntire's sudden takedown of Tucker and the struggle that followed on the ground, it is easy for us—having the benefit of hindsight and multiple angles of video to scrutinize, frame by

frame—to question whether Tucker might have been handcuffed without scuffle or injury if McIntire had immediately verbally consulted with Cisco upon arrival, told Tucker that he was under arrest, and/or repeated Cisco's "put your hands behind your back" instruction to Tucker before forcefully pulling him to the ground.[6] Importantly, however, the legal reasonableness of a police officer's use of force—for purposes of the Fourth Amendment and qualified immunity—is not evaluated with the benefit of hindsight. Rather, our focus is on the officers' reasonable perception of the events at issue, as they happened, *without* the aid of hindsight, multiple viewing angles, slow motion, or the ability to pause, rewind, and zoom.

Considering the record in this manner, we find the district court erred in concluding that the conduct of Officers McIntire and Cisco—in taking Tucker to the ground—was objectively unreasonable in light of pertinent clearly established law in November 2016. For the most part, the cases cited by the district court and Tucker, including some not decided until *after* the November 2016 incident here—simply acknowledge uncontroversial general principles. *See, e.g., Hank v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017) (as of February 26, 2013, "clearly established law demonstrated that an officer violates the Fourth Amendment if he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance, and [was] stopped for a minor traffic violation"). Moreover, *none* of these pronouncements "squarely govern" the particular facts at issue here such that, in November

---

[6] McIntire explained, at his deposition, that he did not personally tell Tucker that Tucker was under arrest, or about to be cuffed, because "if another officer [has already gotten] to that, and it's not working for the other officer, I don't come in and try to do the same thing . . . because then you've got two people yelling at somebody. It's just going to make them agitated even more."

2016, *no* reasonable officer would have thought that the Defendant Officers' takedown of Tucker was legally permissible.

For instance, in *Darden*, which was decided in 2017, we denied summary judgment on qualified immunity grounds, where the arrestee's active resistance was disputed, to an officer who, during a May 2013 drug raid at a private residence, choked, punched, kicked, twice tased, and forced the asthmatic, obese arrestee (weighing 340 pounds) down onto his stomach, shoved his face to the floor, and pulled his hands behind his back for handcuffing, all while being told by others that the arrestee, who died during the arrest, could not breathe. *Darden*, 880 F.3d at 725–27, 730–33.

In *Newman,* decided in 2012, we concluded that an officer's immediate use of his taser (sixteen times) and nightstick (fifteen strikes) during an August 2007 traffic stop—without first attempting physical skill, negotiations, or even commands—was objectively unreasonable in light of clearly established law. *Newman,* 703 F.3d at 759–60, 763–64.

In *Deville,* decided in 2009*,* we found excessive force where, in August 2005, an officer stopped Deville, a 45-year old woman, for a minor traffic violation. Initially denying any wrongdoing, and calling the traffic stop "bullshit," Deville refused to exit the car, which she kept "running" but not "in gear," or to roll down the window, until her husband could arrive to pick up their 2-year old grandchild, who also was in the vehicle. Having arrived in the interim, the police chief smashed the car window with his flashlight, pulled Deville out of her car and threw her against the vehicle, resulting in a blow to her abdomen. As a result of her arrest, Deville suffered multiple contusions, cuts from broken glass, and nerve damage to her hand and fingers, requiring four surgeries, multiple injections, and 13–15 weeks away from her work as a registered nurse. *Deville*, 567 F.3d at 167–68.

No. 19-30247

In *Bone*, which was decided on August 5, 2016, we determined that factual disputes precluded summary judgment on the basis of qualified immunity where, on December 14, 2013, Bone, who denied being told that she was under arrest (for a municipal code violation) and posed no safety threat, turned to walk away from the officer, who then grabbed her wrist and "violently" slammed her face against a nearby car window. *Bone*, 657 F. App'x at 260, 263–64.

In *Goodson,* decided in 2000, police officers broke Goodson's shoulder by tackling him after he had pulled his arm away from one of the officers and moved (a disputed distance) away from police officers (at a disputed speed). Because factual disputes remained as to the existence of reasonable suspicion to detain Goodson, or probable cause to arrest, we declined, on summary judgment review, to extend qualified immunity to the defendant officers. *Goodson,* 202 F.3d at 733, 736–40.

In *Bush*, decided in 2008, summary judgment premised on qualified immunity was denied where, considering Bush's account of the events, she was not resisting arrest or attempting to flee, but was instead restrained and subdued, having been handcuffed, when the defendant, placing his hand behind her neck and head, slammed her face into the rear window of a nearby vehicle, injuring her jaw and breaking two of her teeth. *Bush*, 513 F.3d at 486, 502.

In addition to the cases referenced by the district court, Tucker cites *Trammell v. Fruge*, 868 F.3d 332, 343 (5th Cir. 2017), which was decided on August 17, 2017, regarding Trammell's January 21, 2013 arrest. Construing disputed facts in Trammell's favor, and citing *Goodson,* the panel reversed the district court's grant of summary judgment on the basis of qualified immunity, reasoning that the law at the time of the arrest clearly established that it was

14

No. 19-30247

objectively unreasonable for several officers to tackle an individual who was not fleeing, not violent, not aggressive, and resisted only by pulling his arm away from an officer's grasp by a few inches (but never lost contact with the officer's hand).

Tucker also cites *Brown v. Lynch*, 524 Fed. App'x 69, 80–81 (5th Cir. 2013), an unpublished decision, in which summary judgment likewise was reversed. There, the panel determined that "[a] factfinder could reasonably conclude, based on Brown's [contrary factual] account and the audio and video evidence, that Officer Lynch had struck an unresisting suspect eight times in the body and face with closed fists." *Id.* at 81. Notably, Brown "denie[d] grabbing the burglar bars and likewise denie[d] struggling to resist the officers' efforts to cuff him once he was on the ground." *Id.* at 80. Further, "[t]he video appear[ed] to show Officer Lynch throwing eight punches while Brown was lying on his stomach, all of which came *after* Brown first yelled 'my hands are behind my back!'" *Id.* at 81 (emphasis added).

Here, as compared to all of these cases, the facts and circumstances are materially distinguishable such that, *at a minimum*, reasonable officers would debate whether Defendant Officers' takedown was excessive.　For instance, the district court, endeavoring to construe disputed facts in Tucker's favor, inferred that, prior to the takedown, Tucker had complied with Cisco's order to put his hands behind his back and did not "jerk" his arm away from Cisco and McIntire. On the other hand, the district court likewise observed, the video footage undisputedly reflects slight movement in Tucker's left arm as McIntire grabbed it. And both Cisco and McIntire testified, without contradiction, that they had felt tension in Tucker's arms.[7]

---

[7] Notably, in response to Defendants' statement of facts, Tucker classifies an assessment of body posture ("very tense") as "an opinion, not a fact."

15

No. 19-30247

If this slight movement and tension were the *only* facts supporting Defendant Officers' position, we likely would affirm the district court's denial of summary judgment. As noted by the district court, we have concluded that "[p]ulling [one's] arm out of [an officer's] grasp, *without more,* is insufficient to [establish] an immediate threat to the safety of the officer[]" for purposes of the *Graham* factors. *See Ramirez v. Martinez,* 716 F.3d 369, 378 (5th Cir. 2013) (emphasis added).

Importantly, however, the record here reflects the presence of the essential "more" that was missing in *Ramirez. See id.* ("[A] reasonable officer could not have concluded Ramirez posed an immediate threat to the safety of the officers by questioning their presence at his place of business or [while] laying on the ground in handcuffs."). For starters, as evidenced by the Shreveport Police Department's dispatch of multiple police units, and "clearing the [police radio] channel" for communication with Cisco and outside monitoring of the situation, Tucker's continued driving for a couple minutes, deep into a residential area, rather than promptly stopping in an adjacent empty parking lot in response to Cisco's siren and flashing police lights, ostensibly raised logical concerns about possible resistance and officer safety.

Additionally, McIntire, "from working in the area," reportedly perceived the streets on which Tucker led Cisco, at 11:30 p.m., to be "a high-crime area."[8]

---

[8] In response to Defendants' statement of facts, Tucker disagreed with the assertion that the neighborhood in which he pulled over was "known for high crime activity." Rather, he stated: "This is an opinion, not a fact." On the other hand, though Tucker characterized the house where he ultimately stopped the car as being "like a little out of the drug area," he also described one, if not two, of the streets on which he and Cisco traveled to get to that house as being "drug streets." Although we do not fault the district court for inferring, from Tucker's deposition testimony, that the particular location at which Tucker chose to stop was "not within an area *known* for drug activity," we emphasize that only "the facts [known to *Defendant Officers,*] as a reasonable officer *would perceive them*"—including those conclusions drawn from their considered professional opinions—are material to this appeal. *See Griggs,* 841 F.3d at 313–14 (because the court must measure force used under the facts

16

No. 19-30247

And, he testified: "a lot of times if the police are involved in anything out there, crowds gather, and they're a lot of times hostile towards police." Also, from McIntire's perspective, seeing that Tucker's car "had pulled into a driveway of a residence [was] already kind of a red flag, because you don't know if somebody's [] going to come out of the house on top of you-all or what the deal is, or if they called people."[9] Thus, he explained, his "initial intention[] when [he] got to the scene was . . . to go assist Cisco and take [Tucker] into custody." *Id.*[10]

Furthermore, along with capturing the slight movement of Tucker's arm, as Cisco and McIntire attempted to handcuff him, the police videos show Tucker to be at least a few inches taller than Cisco and several inches taller than McIntire.[11] The video footage also reflects Tucker's extreme and increasing anger and agitation—both verbal and physical—as he approached and then stood in front of Cisco's vehicle, throughout the time that Cisco worked at patting down his baggy, sagging clothes, and, notably, at the point of McIntire's arrival on the scene. Importantly, though Tucker's hands always remained visible, and did not reach back toward Cisco, they *never* were still, and certainly may be described as "flailing about" in an erratic, unpredictable

---

as a reasonable officer would perceive them, though a jury might find plaintiff was not actually resisting arrest, the court, in the summary judgment context, must "first constr[ue] disputed historical facts in favor of the non-movant, [and] . . . then ask how a reasonable officer would have perceived those historical facts").

[9] Notably, the police offense report narrative completed by Johnson states that, by the time that Defendant Officers had contained Tucker, a "crowd [was] starting to form."

[10] Cisco testified to similar intentions. That is, he explained, McIntire, having worked with Cisco "long enough," would have known that Cisco, as soon as another officer arrived on the scene, would "place [Tucker] in handcuffs, especially with the way that [Tucker] was acting."

[11] The police offense report completed by Cisco declares Tucker's height to be 6'4" and his weight to be 165 pounds. Tucker's emergency room record identifies 6'3" as his height and 170 pounds as his weight.

17

manner. Indeed, as McIntire approached Cisco and Tucker, the video undisputedly shows Tucker expressing his anger and frustration by repeatedly banging his fist on the vehicle, waving his pointed finger in the air, and vigorously clapping his hands several times in a manner surely sufficient to trigger some reasonable concerns about safety and Tucker's mindset. This is particularly true when coupled with Defendant Officers' assertion that Tucker smelled of marijuana, and Tucker's loud, nonstop verbal tirade reflecting anger, frustration, and perceived racism, interspersed with cursing, and repeated, increasingly strident, complaints of being "tired of this shit."

Added to this, when McIntire started pulling Tucker's left arm back to place him in handcuffs, Tucker (seeing McIntire to his left, and Johnson approaching on his right) already visibly overwrought, suddenly became even more upset, yelling: "What y'all, what y'all, what y'all fucking with me for?"[12] Immediately thereafter, both McIntire and Cisco report feeling Tucker "tensing up" and the aforementioned "slight arm movement." McIntire also testified that, at that point, he felt like he was losing his grip on Tucker. Thus, "due to [Tucker]'s height and agitated demeanor and everything," McIntire reportedly thought the officers could "control this situation better on the ground" but had "[n]o intentions of getting physical." Rather, he thought: "We're just going to put him on the ground. That way, we [can] get some leverage on him and put him in cuffs since he's already trying to pull away."

Faced with this scenario, viewed in its entirety, an officer in McIntire's position, having just arrived on the scene, could reasonably question whether Tucker might attempt to break away, fight being handcuffed, or even attempt to grab one of the officer's weapons. At a minimum, he could reasonably

---

[12] *See* McIntire Video at 23:36:58.

question whether Cisco had sufficient control over the scene or instead required immediate officer assistance. And, while consultation amongst the officers and Tucker might have quelled such concerns, hesitation for that purpose, absent an ability to predict the future with certainty, likewise could well have operated to the officers' detriment. This is evident, notwithstanding the district court's inference that a reasonable officer, in Defendant Officers' position, would have believed that Tucker was unarmed after Cisco removed the pocketknife from Tucker's pocket. *See, e.g., Renfroe v. Parker,* 974 F.3d 594, 600 (5th Cir. 2020) (recognizing an individual need not be armed for police officer to believe that he is in danger of serious physical harm and that an officer's duty to warn a suspect before using force depends on time availability).

Given these uncertainties, and Tucker's superior height, particularly relative to McIntire, who apparently precipitated the officers' efforts to get Tucker to the ground,[13] we are convinced that the district court erred in its qualified immunity assessment of the "takedown" aspect of Tucker's claim.[14] Specifically, we are not convinced that applicable jurisprudence provided fair warning to Cisco and McIntire, as of November 30, 2016, that pulling Tucker to the ground under the circumstances and in the manner that occurred here

---

[13] Tucker testified that Cisco "was doing nothing but holding my right arm" when "the other officer . . . grabbed my left arm and yanked me down while it was behind my back." Additionally, when asked how he was taken to the ground, he responded that he was "pulled."

[14] Although Officers Cisco, McIntire, and Johnson outnumbered Tucker by a ratio of 3:1 at the time of the takedown, the police vehicle videos show Johnson lagging behind McIntire in approaching Cisco and Tucker. Furthermore, McIntire testified that he did not see Johnson approach and was unaware of Johnson's actual whereabouts. That is, McIntire did not know whether Johnson had followed him from the police vehicle or instead had approached Tucker's car, parked in the house's driveway, wherein the passenger remained. McIntire's focus reportedly was concentrated on Tucker and Cisco—"where the immediate possibility of a threat could be." And, while Cisco knew that Johnson was "on the scene," and thought that Johnson was "behind [McIntire]," Cisco likewise was "not sure" of Johnson's exact proximity.

would necessarily violate his Fourth Amendment rights against unreasonable seizure.[15]

Rather, even construed in Tucker's favor for summary judgment purposes, the foregoing facts and circumstances, when viewed in their entirety, created a scenario sufficiently "tense, uncertain, and rapidly evolving" to place the officers' takedown of Tucker, even if mistaken, within the protected "hazy border between excessive and acceptable force," established by then-existing Fourth Amendment excessive force jurisprudence. Consequently, it is immaterial whether, as the dissent urges, the video footage "does not blatantly contradict" Tucker's assertion that, immediately prior to the takedown, he was putting his hands behind his back in compliance with Cisco's orders and did not pull away prior to being taken to the ground. Accordingly, we find the district court erred in not granting summary judgment in favor of Defendant Officers, on grounds of qualified immunity, relative to the takedown.

B. Force On the Ground

Turning to Defendant Officers' use of force against Tucker while he was on the ground, the district court concluded, in pertinent part:[16]

> Once on the ground, Defendant Officers each punched Tucker at least once, and McIntire kicked him at least three times. As discussed above, the reasonableness of the officers' use of repeated strikes and kicks must be measured in light of the *Graham* factors. The misdemeanor and traffic violations of which he was suspected did not of themselves warrant a particularly high degree of force. [As reflected in the video recording taken from McIntire's police vehicle], [once Tucker] landed on the ground, four

---

[15] *See, e.g.*, *Carroll v. Ellington*, 800 F.3d 154, 175 (5th Cir. 2015) (noting that "a police officer who is standing over a suspect who is on the ground has a 'position of advantage over that subject,' meaning the officer 'can control [the subject's] body movement,' and that 'the subject will offer less resistance'").

[16] *See* February 27, 2019 Mem. Ruling at 21–24. (Emphasis added.).

No. 19-30247

officers surrounded him and were able to handcuff him in less than a minute;[17] the fact that there were four officers and that Tucker was on the ground where he had less room to maneuver suggests a reduced threat to officer safety. On the other hand, Defendant Officers have testified that Tucker was pulling his arms from their grasp and failing to put them behind his back, facts that Tucker has not disputed.

Although the Court infers for summary judgment purposes that a reasonable officer with the knowledge of Cisco, McIntire, and Johnson would not have believed that Tucker was armed, [Officer] Kolb did not witness the patdown and so could reasonably have believed that Tucker was armed. While Tucker was not attempting to flee, he was kicking his legs while on the ground and was not laying still in order to allow himself to be handcuffed. As discussed above, the Court infers for summary judgment purposes that he was not intentionally kicking at the officers. Nevertheless, these kicks were a form of physical resistance. On these facts, Defendant Officers were entitled to use heightened force in order to gain control of Tucker's hands and place him in handcuffs. *See Mathews v. Davidson*, 674 F. App'x 394, 396 (5th Cir. 2017) (per curiam); *Carroll v. Ellington,* 800 F.3d 154, 176 (5th Cir. 2015).

The question then becomes whether the particular force used was reasonable in light of the heightened force that Defendant Officers could lawfully use at this point. *Deville*, 562 F.3d at 167 (quoting [*Gomez v. Chandler,* 163 F.3d 921, 923 (5th Cir. 1999)]). Distraction strikes and even kicks designed to gain compliance to being handcuffed are "measured or ascending" responses to an actively resisting suspect. [*Poole v. City of Shreveport,* 691 F.3d 624, 629 (5th Cir. 2012) (quoting *Galvan v. City of Antonio*, 435 F. App'x 309, 311 (5th Cir. 2010)]; *Carroll*, 800 F.3d at 176. While on the ground, Tucker was struggling.[18]

---

[17] *See* McIntire Video at 23:37:01-:58.

[18] *See* Cisco Video at 23:37:10–26; McIntire Video at 23:37:10, 23:37:22; and Kolb Video at 23:37:05–07.

No. 19-30247

Defendant Officers struck Tucker repeatedly but without using []
all their strength. And so, their resort to controlled strikes in order
to cause Tucker to cease moving about and submit to being
handcuffed would not necessarily violate the Fourth Amendment.

A difficulty arises here because a use of force that may begin
as reasonably necessary in order to obtain compliance may cease
to be so as a suspect becomes more compliant. *See Carroll*, 800
F.3d at 177 (citing *Bush*, 513 F.3d at 501–02; *Gomez,* 163 F.3d at
922, 924–25) ("[O]nce a suspect has been handcuffed and subdued,
and is no longer resisting, an officer's subsequent use of force is
excessive."). The videos do not show most of Tucker's body. Given
the inability to know if Tucker had stopped resisting and placed
his hands behind his back before the blows ceased, the Court
cannot determine as a matter of law that the sheer number of
blows and kicks that he received was reasonable. Hence, the Court
denies summary judgment on the issue of whether Defendant
Officers violated Tucker's Fourth Amendment rights.

However, this claim may still be put to rest if Defendant
Officers are entitled to qualified immunity. They are immune from
suit unless caselaw has established, on similar facts, that their
conduct violated the Fourth Amendment. *See White,* 137 S. Ct. at
552. Tucker points the Court to *Bush v. Strain* in which the
plaintiff was handcuffed and subdued at the time the defendant
officer slammed her face into a nearby vehicle. 513 F.3d at 501. As
Tucker was neither restrained nor subdued when Defendant
Officers began to strike him*, Bush* does not clearly establish that
Defendant Officers should have known that they could not strike
Tucker in order to gain his compliance. However*, Bush* does clearly
establish that once Tucker ceased kicking his legs and was
handcuffed, the violent striking of him needed to stop. *See id.*
Because the video does not clearly show the precise point at which
Tucker ceased moving and was finally handcuffed, this factual
uncertainty prevents the Court from concluding that all of the
force used by Defendant Officers as Tucker lay on the ground
complied with the clearly established principle that officers cannot

strike a subdued and restrained suspect. Because Defendant Officers are not entitled to qualified immunity for the force used against Tucker as he lay on the ground, summary judgment is denied.

Accordingly, regarding the force used against Tucker while he was on the ground, the district court determined that Defendant Officers were not entitled to qualified immunity *solely* for the reason that Tucker's position was such that the video footage did not show whether Defendant Officers ceased striking him, as required by *Bush v. Strain,* as soon as he became still enough to be handcuffed. The fatal flaw in this determination, however, is that Tucker never alleged that Defendant Officers continued to strike or kick him after he was subdued, *i.e.,* no longer kicking his legs or otherwise actively resisting Defendant Officers' efforts to restrain and handcuff him. Specifically, neither the complaint, the statement of facts, nor the opposition memorandum that Tucker submitted in the district court clearly states that assertion.[19] Additionally, when asked about such force during his deposition, Tucker testified that he did not recall any force being used after he was handcuffed. In their own depositions, Defendant Officers denied using such force. Thus, the factual uncertainty regarding the use of force on the ground that was identified as an obstacle to qualified immunity by the district court actually is immaterial to the claims asserted in this proceeding as Tucker never asserted a claim involving use of force *after* he was subdued.[20]

---

[19] Tucker's attempts, on appeal, to fill this void at oral argument and in the appellee brief that he filed following the court's appointment of appellate counsel must be rejected as too little, too late. To support the substance of this contention, Tucker's only record citations are to the district court's opinion and a single inconclusive paragraph of the complaint that was not referenced (much less clarified) until the November 19, 2020 oral argument before this court.

[20] The available video and audio footage, though alone not determinative, does not suggest the opposite to be true. The videos appear to reflect all Defendant Officers, except

No. 19-30247

Focusing instead on the amount of force that Defendant Officers used on the ground in order to subdue and restrain Tucker, who undisputedly struggled against the officers,[21] the district court concluded that Defendant Officers' resort to multiple controlled strikes, *i.e.*, strikes without using all of the officers' strength and limited wind-up, would not necessarily violate the Fourth Amendment. And referencing *Bush v. Strain*, the district court concluded: "As Tucker was neither restrained nor subdued when Defendant Officers began to strike him*, Bush* does not clearly establish that Defendant Officers should have known that they could not strike Tucker in order to gain his compliance." Considering the record before us, as summarized by the district court, *supra*,

---

Cisco, suddenly stilling and then, as soon as Cisco is able to handcuff Tucker, standing and moving away. *See* McIntire Video at 23:37:44-59. Similarly, during the time that Defendant Officers are seen struggling with Tucker on the ground, the officers and Tucker's female companion repeatedly yell to Tucker: "Put your hands behind your back" and "Stop resisting." *See* McIntire/Kolb Video, 23:37:00–01; McIntire Video, 23:37:13–23 and 23:37:30–52. Notably, these verbal directives cease less than 20 seconds before Officers Kolb and McIntire stand and move away from Tucker and less than 40 seconds before Tucker, now handcuffed, and Cisco rise and walk toward Cisco's police vehicle. *See* McIntire/Kolb Video, 23:37:37–40; McIntire Video, 23:37:57–59; and McIntire/Kolb Video, 23:38:00–04. The return of Tucker's voice to its normal state (as opposed to muffled) likewise coincides with the apparent cessation of the fracas and footage reflecting Kolb rising to a standing position—no longer touching Tucker. *See* McIntire Video, 23:37:57–58.

[21] *See* Cisco Video at 23:37:10-26; McIntire Video at 23:37:1; 23:37:22; Kolb Video at 23:37:05-07)]. To the extent that Tucker denied he was resisting before the district court, he did so only in blanket terms (claiming not to have resisted *at all*) or specifically in reference to the moments leading up to the takedown. As an example of the former, in his statement of material disputed facts to the district court he claimed he "did not resist arrest at any time." As to the latter, in his Opposition, for example, he consistently framed his alleged compliance in terms of the moments *before* "McIntire approached and immediately grabbed him and threw him to the ground." Compliance prior to the takedown is discussed at length in Section IV.A, so we need not retread that ground here. In any event, video evidence clearly shows resistance on the ground, as well as arm movements that could reasonably cause officers to believe Tucker was resisting while standing. Thus, the allegation that Tucker was compliant at *all* times, is "blatantly contradicted by the record," such that Tucker's allegations to the contrary constitute the "visible fiction" on which the Supreme Court has counselled against "rel[ying]." *Scott*, 550 U.S. at 380–81.

we agree.[22] Given this determination, we additionally find that the district court erred in not granting summary judgment in Defendant Officers' favor, on qualified immunity grounds, relative to the force used against Tucker while he was "on the ground."

Most important to this conclusion is Tucker's failure to dispute the Defendant Officer's testimony that Tucker was pulling his arms from their grasp and failing to put them behind his back.[23] On this point, McIntire testified that Tucker had freed his arms from the officers' grasps and, whilst on the ground, had them underneath his body, not giving his hands to the officers for cuffing. Then, Tucker had "rolled halfway over, still not giving his hands." The narratives completed by the officers report the same. And, though not attempting to flee, Tucker was kicking his legs and not lying still in order to allow himself to be handcuffed. Even if Tucker was not intentionally kicking *at* the officers, the kicks, on the instant record, were reasonably perceived by

---

[22] Construing factual uncertainties in Tucker's favor, the district court characterized McIntire's leg movements, reflected in the video, as "three kicks." Although the notion of law enforcement officers kicking arrestees is unsettling, Tucker has not presented authority establishing a complete prohibition of such conduct. Furthermore, in the context of a scenario such as that presented here, combining numerous persons and their quickly moving and shifting limbs in a relatively small area, it is not inconceivable that officers sometimes reasonably resort to strikes accomplished by foot or knee, as was done here. Indeed, McIntire explained that, at one point, with the "weird" positioning, and Kolb's addition to the group, McIntire was kind of "wedge[d] out" and "unable to put his hands on Tucker." In any event, the video does not show, and Tucker has not asserted, that McIntire's kicks were conducted in a manner to deliver the maximum power possible. Furthermore, as the district court reasoned, the relatively mild nature of Tucker's injuries prevents a reasonable inference that he was struck with the maximum amount of force that Defendant Officers could employ. Thus, in this context, we are comfortable granting summary judgment on the basis of qualified immunity with respect to the strikes delivered by Defendant Officers' hands *and* feet.

[23] Although Tucker has not specifically denied this conduct, the only movement to which he admits is jerking his head "from side to side," when the officers were "like trying to push[his] face to the ground" so that his faced would not hit the concrete a second time, noting that he "used to model" and "so [he] care[s] about [him]self."

Defendant Officers to be a form of physical resistance.[24]  On these facts, given Tucker's refusal to comply with their verbal directives to put his hands behind his back and quit moving, it would not have been evident to Defendant Officers, based on clearly established law, that they were not entitled to use heightened force in order to gain control of Tucker's hands and place him in handcuffs. *Poole*, 691 F.3d at 632 (use of force was reasonable when it involved "measured and ascending responses" to an actively resisting suspect). At a minimum, officers of reasonable competence could disagree as to whether Tucker's rights were violated.

Arguing against qualified immunity, Tucker emphasizes that he was outnumbered, there being four officers to him alone, and that he was on the ground where he had less room to maneuver, thereby suggesting a reduced threat to officer safety. There is logic to this assertion. Nevertheless, even accepting—as we must in this interlocutory appeal—the district court's inference that a reasonable officer with the knowledge of Cisco, McIntire, and Johnson would *not* have believed that Tucker was armed, Kolb did not witness the patdown and thus could have reasonably believed that Tucker might be armed.  Additionally, upon arriving, Kolb encountered a melee consisting of three fellow officers unsuccessfully trying to control a single civilian, who Kolb knew had purposely driven well into this residential area, rather than promptly pulling over in response to Cisco's signal. Under these circumstances, Kolb understandably simply sought to immediately assist, rather than seeking a status update from the other officers, or considering and suggesting an alternative means of handling the situation.  And the record undisputedly

---

[24] On this point, Cisco testified that Tucker was kicking his feet, which Cisco thought to be intended to create separation from the officers.  He explained: "He was laying on the ground, kicking his feet kind of like he was on a bicycle. He's going [] straight back, straight forward, like you pedal a bicycle. . . . I believe he was trying to create separation from officers."

reflects that it was only with Kolb's assistance that the officers were able to gain control of Tucker's arms such that he could be placed in handcuffs. According to Kolb, "it took everything to get that one arm" so "my entire focus was [on] that." When asked how Tucker was able to hold his arm away from Kolb, "a pretty big guy," Kolb explained: "He kept pulling his arms into the center of his body.  And I don't care how strong you are, if someone resists that violently, I can be 6'7", 280 [pounds], and it's not easy."

In hindsight, knowing as we do that Tucker was unarmed, was not in possession of drugs or other contraband, and was pulled over for a non-violent traffic offense, it is regrettable that Tucker suffered *any* injury or indignity at the hands of law enforcement officers, no matter how slight or temporary.  And, of course, one might logically wonder if injury could have been avoided, or at least lessened, if one of the five persons involved had reacted differently. In one respect, the answer certainly is "yes"; that is, Tucker could have obeyed and pulled over when Cisco signaled; or he could have quieted, stilled, and put his hands behind his back when ultimately stopped. Otherwise, in these scenarios, unlike in boxing, there unfortunately is no referee to ring a bell requiring everyone to "return to their corners" for time out to rest, re-evaluate, and reconsider strategies.

Even so, one might argue that, at some point in the maelstrom, considering that Tucker was on the ground and surrounded by three, and then with Kolb's arrival, four officers, including one of substantially superior height and brawn (Kolb), one of the officers could, or should, have called for a pause—that is, for the officers to cease any efforts to physically restrain Tucker—in order to give Tucker an opportunity, void of confusion and in a moment of calm, to make the logical decision to simply cooperate in Cisco's efforts to handcuff him, despite believing handcuffs to be unwarranted.  We need not and do not

No. 19-30247

decide that question today, especially on the instant record, reflecting that the entirety of the struggle lasted less than one minute. And, importantly, for its duration, the situation was replete with rapid movement, confusion, and the (apparently ignored) repeated directives, both by Defendant Officers and Tucker's onlooking girlfriend, for Tucker to: "Put your hands behind your back! Stop moving! Stop resisting! Quit moving! Quit resisting!"

In any event, clearly established law, as of November 30, 2016, certainly did not impose such a requirement. Nor, on the instant facts, viewed from the perspective of the officers, as the events occurred, *not* from hindsight, is this situation one in which it should have been obvious to Defendant Officers, even in the absence of pre-existing, factually similar case law, that the force being utilized was excessive.

V.

For the reasons stated herein, we find that the district court erred in concluding that factual issues preclude application of qualified immunity relative to Tucker's claims against Defendant Officers' in their individual capacities. Accordingly, we **REVERSE** and **REMAND** that aspect of the district court's February 27, 2019 ruling for entry of summary judgment in favor of Defendant Officers.

No. 19-30247

STEPHEN A. HIGGINSON, Circuit Judge, dissenting:

The district court, in an extensively detailed order, determined that issues of fact precluded summary judgment based on qualified immunity for the Defendant Officers. I agree with the district court that fact issues remain as to whether Tucker, a motorist whose brake light was out, actively resisted arrest to justify a sudden, violent takedown and repeated physical blows and open kicks while prone and unarmed and surrounded by officers. *See Trammell v. Fruge*, 868 F.3d 332 (5th Cir. 2017); *see also Wright v. City of Euclid*, 962 F.3d 852 (6th Cir. 2020). I would affirm the district court.

Video footage of the incident confirms the violent takedown and Defendant Officers' use of repeated strikes and kicks against Tucker while he was on the ground. Tucker asserts that, immediately prior to the takedown, he was putting his hands behind his back in compliance with Officer Cisco's order and did not pull away from Officers Cisco and McIntire prior to being taken to the ground. The footage does not "blatantly contradict" his account. *See Darden v. City of Fort Worth*, 880 F.3d 722, 729 (5th Cir. 2018); *see also Scott v. Harris*, 550 U.S. 372 (2007).

The law is clearly established that the use of violent physical force against—not to mention the extreme violence of kicking—an arrestee who is not actively resisting arrest is a constitutional violation. *Darden*, 880 F.3d at 731. It may be that the Defendant Officers will nonetheless prove entitled to qualified immunity for the extreme force they used against Tucker from start to finish. But, as the district court found, a jury must first resolve the factual uncertainty as to whether Defendant Officers had justification and urgency to throw Tucker down and repeatedly strike and kick him. *See Joseph v. Bartlett*, 981 F.3d 319, 342 (5th Cir. 2020); *Goode v. Baggett*, 811 F. App'x 227, 232 (5th Cir. 2020); *see also Wright*, 962 F.3d at 868 (whether motorist's "arm

29

movement" was active resistance as opposed to passive presents a quintessential jury question, indeed, noting that such movement could be deemed "minimal to the extent that it constituted resistance at all").

I regret not having persuaded the majority. I hope, however, our disagreement highlights the importance of recent attention given to the issue of qualified immunity and violent police-citizen encounters. *See Cole v. Carson*, 935 F.3d 444 (5th Cir. 2019) (en banc); *id.* at 470 (Willett, J., dissenting); *id.* at 473 (Ho & Oldham, JJ., dissenting); *see also Jamison v. McClendon*, 476 F. Supp. 3d 386, 423 (S.D. Miss. 2020) (exhortation to revisit doctrine of qualified immunity). From my perspective, it is not our role to second guess a district court's assessment of factual disputes, here pretermitting resolution of uncertainties about excessive force, specifically why police inflicted such abrupt and steadily escalating violence against this motorist whose brake light was out.

When there is no dispute about the reasonableness of the use of force, for example when an arrestee flees or is an aggressor, the doctrine of qualified immunity will shield defendant officers. But here, I agree with the district court that qualified immunity is not yet an available tool to resolve this fact-laden, extended, and brutal police-citizen encounter. *See generally Graham v. Connor*, 490 U.S. 386, 396 (1989). Instead, careful resolution properly comes, and constitutionally must come, from citizen peer jurors. Their fair assessment is vital as much for fellow citizens like Tucker and public trust, as it is for the police who respond to situational threats with professional restraint and seek to be distinguished from the few who do not, whose misconduct is maliciously unrestrained. One acting under color of law who throws a fellow citizen to the ground and then, when the other is prone,

surrounded, and unarmed, repeatedly strikes and kicks him, surely gives rise to a material question of fact as to whether that government force is excessive.