# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————

No. 15-11295

————

United States Court of Appeals
Fifth Circuit

**FILED**

April 5, 2017

Lyle W. Cayce
Clerk

MARCUS HANKS,

      Plaintiff - Appellant

v.

OFFICER RANDALL ROGERS, Individually,

      Defendant - Appellee

————

Appeal from the United States District Court
for the Northern District of Texas

————

Before ELROD, SOUTHWICK, and GRAVES, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:

Below, the district court dismissed Marcus Hanks's Section 1983 claim against a police officer, Randall Rogers, at summary judgment on the basis of qualified immunity. We REVERSE and REMAND to the district court for further proceedings consistent with this opinion.[1]

---

[1] This court has previously denied Hanks's motion to file out of time a motion for reconsideration in his separate appeal of the district court's dismissal of claims against the City of Grand Prairie, Texas. We therefore decline to consider arguments raised in Hanks's initial brief regarding those claims.

No. 15-11295

## FACTUAL BACKGROUND[2]

On the evening of February 26, 2013, Hanks was driving slowly along Interstate 30 in Grand Prairie, Texas. Hanks hoped to find his cellular telephone on the shoulder of the road—Hanks accidentally left the phone on top of his car at the outset of his trip, and, upon realizing his mistake, aimed to find where the phone slid off along the roadway.

Officer Rogers, a member of the Grand Prairie Police Department, observed Hanks driving with his vehicle's hazard lights engaged and approximately 20 miles per hour under the interstate speed limit. Rogers turned on his patrol car's emergency lights, and Hanks immediately pulled his car onto the shoulder of the interstate.

Officer Rogers stopped his patrol car a short distance behind Hanks's vehicle and walked to Hanks's passenger-side front window. Once at the window, Officer Rogers stated that he had stopped Hanks because Hanks was driving 20 miles per hour below the speed limit. Hanks told Officer Rogers that he was searching for his phone.

After a brief exchange regarding the phone, Officer Rogers asked Hanks to produce his driver's license and insurance. Hanks immediately presented his driver's license. Hanks could not, however, locate an insurance card for the vehicle, which he had borrowed with permission from a relative. After waiting silently at the window for almost one minute, Officer Rogers stated that he would "be right back." Only a second or two later, Officer Rogers instructed Hanks to "step out of the vehicle and come to the back."

According to Officer Rogers, he ordered Hanks to exit the vehicle "[i]n an attempt to decrease . . . Hanks' anger." Officer Rogers states that when he

---

[2] The record on appeal contains an audiovisual recording of the encounter captured by a camera in Officer Rogers's police vehicle. The recording may be accessed via the following internet link: http://www.ca5.uscourts.gov/opinions/pub/15/15-11295.mp4.

asked Hanks for his driver's license and insurance, "Hanks appeared upset and began to cuss at [Officer Rogers] for stopping him." Hanks denies that he "cuss[ed] at or act[ed] aggressive to Officer Rogers" while sitting in the vehicle.

Hanks did not immediately exit his vehicle. Instead, he questioned the basis for Officer Rogers's instruction. Officer Rogers repeated his instruction six times during the approximately 45-second exchange, and also calmly told Hanks to "put his stuff up." Hanks exited the vehicle after Officer Rogers adopted a more assertive tone and added "do it now" to his instruction. As Hanks exited the vehicle, Officer Rogers turned his back to Hanks's car for about three seconds and walked towards his patrol car.

Officer Rogers next pointed his flashlight at a spot on the ground between the two vehicles and instructed Hanks to stand there. Hanks silently complied with that instruction. While walking to the spot Officer Rogers indicated, Hanks pulled his shirt sleeves up to his elbows. Hanks also placed his right hand into his pants pocket for about three seconds.

Officer Rogers instructed Hanks to take his hands out of his pockets, but by that time Hanks only had his thumbs tucked inside his pockets. In response to the instruction, Hanks said, "what?" Officer Rogers repeated his instruction, and Hanks lifted his hands to his waist, palms towards Officer Rogers, while saying "my hands aren't in my pockets." Officer Rogers then instructed Hanks to place his hands on the rear of Hanks' vehicle.

In response to Officer Rogers's command to place his hands on the car, Hanks moved towards the rear of his vehicle while saying, "for what? I . . . did nothing." Hanks initially leaned back against the rear of his vehicle, but after about one or two seconds, and in response to Officer Rogers repeating his commands while drawing his taser, Hanks turned his back to Officer Rogers and placed his hands on the trunk of his car.

No. 15-11295

Within two or three seconds, Officer Rogers next instructed Hanks to put his hands behind his head. Hanks immediately raised his left hand to the back of his head, and placed his right hand behind his head moments later, simultaneously with Officer Rogers' repetition of the command.

As soon as Hanks's hands reached the back of his head, Officer Rogers instructed Hanks to "go to [Hanks's] knees." In response, Hanks looked over his right shoulder and asked, "for what?" Hanks simultaneously moved his hands to his rear, so that they were folded behind his back with his empty palms facing Officer Rogers. Officer Rogers repeated his command twice more over the next five seconds, and, with his hands still plainly visible behind his back, Hanks looked over his left shoulder to ask whether he was under arrest. Officer Rogers responded by repeating his command, and Hanks said something inaudible on the recording before again asking whether he was under arrest. Officer Rogers only responded by repeating his command.

About five seconds after Hanks asked whether he was under arrest for the second time, and immediately after Officer Rogers repeated his command for Hanks to "go to [his] knees," Hanks made a small lateral step with his left foot. When Hanks took this small step, his empty hands remained surrendered behind his back. He continued to face away from Officer Rogers, so his hands stayed in Officer Rogers's view. Officer Rogers still had his taser trained on Hanks.

Almost simultaneously with Hanks's small step, Officer Rogers rushed towards Hanks and administered a blow to Hanks's upper back or neck (the parties refer to this as a "half spear"). The blow forced Hanks's upper body onto the trunk of his vehicle. Officer Rogers maintained contact with Hanks as Hanks shifted onto the ground.

Once on the ground, Hanks laid face-down and placed his hands behind his back. Hanks offered no resistance while Officer Rogers handcuffed him.

4

No. 15-11295

Later, while sitting in Officer Rogers's patrol car, Hanks requested medical care. Officer Rogers issued Hanks a traffic citation, and medics transported Hanks to Baylor Medical Center. Hanks states that he received treatment for "Assault; Contusion; Strain; [and] Acute Myofascial Strain" and received prescriptions for pain medications. Hanks asserts that the blow administered by Officer Rogers has caused him "continuous pain in [his] upper back, neck, head, and ribs," as well as psychological fear.

The Grand Prairie Police Department subsequently conducted an investigation that led to Officer Rogers's indefinite suspension. The department's investigation concluded Officer Rogers's "half spear . . . was not objectively reasonable to bring the incident under control . . . based on Mr. Hanks' lack of resistance." The department's investigation noted Officer Rogers's "fail[ure] to communicate to a citizen [i.e., Hanks] [that] he was under arrest." Notably, the investigation report viewed Hanks as a "compliant subject."

## PROCEDURAL HISTORY

Several months after the incident, on December 16, 2013, Hanks filed a complaint against Officer Rogers and the City of Grand Prairie. Hanks's complaint included a claim against Officer Rogers under 42 U.S.C. § 1983, alleging Officer Rogers used excessive force against him in violation of the Fourth Amendment. On August 6, 2015, the district court granted summary judgment in favor of Officer Rogers on the basis of his qualified immunity defense. In relevant part, the district court concluded that, "[e]ven drawing all inferences in light most favorable to [Hanks], [Hanks] has not shown that the force used was objectively unreasonable." The district court entered a final judgment dismissing Hanks's claims against Officer Rogers with prejudice on the same day.

5

No. 15-11295

On September 3, 2015, Hanks moved for a new trial, challenging the district court's grant of summary judgment in favor of Officer Rogers. Considering the motion as a motion for reconsideration, the district court denied the requested relief on December 2, 2015.

Hanks appealed from the final order denying his motion for a new trial on December 30, 2015.

## STANDARD OF REVIEW

"This court reviews de novo the district court's resolution of legal issues on a motion for summary judgment on the basis of qualified immunity." *Griggs v. Brewer*, 841 F.3d 308, 311 (5th Cir. 2016). "Summary judgment is proper when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* at 311–312.

"In reviewing an appeal from summary judgment, we 'view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.'" *Id.* at 312 (quoting *Deville v. Marcantel*, 567 F.3d 156, 163–64 (5th Cir. 2009)). However, "[*Scott v. Harris*] instructs that a plaintiff's version of the facts should not be accepted for purposes of qualified immunity when it is 'blatantly contradicted' and 'utterly discredited' by video recordings." *Curran v. Aleshire*, 800 F.3d 656, 664 (5th Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)).

## ANALYSIS

"A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.*

"In determining qualified immunity, courts engage in a two-step analysis." *Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016). "First, they

assess whether a statutory or constitutional right would have been violated on the facts alleged." *Id.* "Second, they determine whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 312–13.

"In excessive force cases, 'the second prong of the analysis is better understood as two separate inquiries: whether the allegedly violated constitutional rights were clearly established at the time of the incident; and, if so, whether the conduct of the defendants was objectively unreasonable in light of that then clearly established law.'" *Id.* at 313 (quoting *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005). "If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact." *Id.* (quoting *Tarver*, 410 F.3d at 750).

At the first step, we conclude Hanks has alleged facts which, when viewed in the manner most favorable to him, would establish a violation of Hanks's Fourth Amendment right to be free from excessive force during a seizure. Turning to the second step, we conclude the constitutional right at issue was clearly established at the time of the incident, and that Officer Rogers's conduct was objectively unreasonable in light of then-existing clearly established law. We therefore hold that Hanks has met his burden of rebutting Officer Rogers's qualified immunity defense.

## I.    Constitutional Violation

"To prevail on an excessive-force claim, [a plaintiff] must show '(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016) (quoting *Elizondo v. Green*, 671 F.3d 506, 510 (5th Cir. 2012) and *Collier v. Montgomery*, 569 F.3d 214, 218 (5th Cir. 2009)). Our precedents recognize that inquiries regarding whether a use of force was "clearly excessive" or "clearly unreasonable . . . are often

intertwined," *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012), and we consider those questions together below. We conclude that Hanks has adduced sufficient evidence regarding each element of an excessive force claim to survive summary judgment.

### A. Injury

"[W]e no longer require 'significant injury' for excessive force claims," *Tarver v. City of Edna*, 410 F.3d 745, 752 (5th Cir. 2005) (citing *Harper v. Harris County, Tex.*, 21 F.3d 597, 600 (5th Cir. 1994)), but "the injury must be more than *de minimis*," *id.* (citing *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir.1999)).

Officer Rogers contends that Hanks's injuries "are *de minimis*, and are thus insufficient to support a claim for excessive force." Appellee's Br. at 26. We disagree.

On the night of his encounter with Officer Rogers, Hanks received medical treatment at the Baylor Medical Center at Irving. There, he received a diagnosis noting contusions, acute strains, and bruised ribs. Hanks received two prescriptions for pain medication and a form releasing him from work for two days. According to Hanks, he still experiences pain in his upper back, neck, head, and ribs as a result of the encounter. Hanks's allegations, read in light of the contemporaneous medical documentation in the record, state more than a *de minimis* injury.

### B. Clearly excessive and clearly unreasonable use of force

"Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Deville*, 567 F.3d at 167 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "Factors to consider include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the

officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396).

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. "We must adopt 'the perspective of a reasonable officer on the scene, rather than judge with the 20/20 vision of hindsight.'" *Cooper*, 844 F.3d at 522 (brackets omitted) (quoting *Graham*, 490 U.S. at 396). "Our inquiry is 'whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation.'" *Cooper*, 844 F.3d at 522 (brackets and internal quotations omitted) (quoting *Graham*, 490 U.S. at 397).

We conclude that under the circumstances documented in the recording in this case, a reasonable officer on the scene would have known that suddenly resorting to physical force as Officer Rogers did would be clearly excessive and clearly unreasonable.

### 1. Severity of violations

Officer Rogers stopped Hanks for driving 20 miles per hour below the posted speed limit. Hanks was unable to produce proof of insurance for the vehicle he was driving in the time Officer Rogers allowed.[3] These "minor traffic violation[s] . . . ma[de] the need for force substantially lower than if [Hanks] had been suspected of a serious crime." *See Deville*, 567 F.3d at 167.

---

[3] The Grand Prairie Police Department's investigation of this incident concluded that "Mr. Hanks was not given sufficient time to attempt to locate his proof of insurance . . . ."

No. 15-11295

### *2. Immediate safety threat*

Mindful that "[w]e must adopt 'the perspective of a reasonable officer on the scene, rather than judge with the 20/20 vision of hindsight,'" *Cooper*, 844 F.3d at 522 (brackets omitted) (quoting *Graham*, 490 U.S. at 396), we nonetheless perceive little basis in the recording from which Officer Rogers could have reasonably viewed Hanks as "an immediate threat to the safety of [Officer Rogers] or others," *Graham*, 490 U.S. at 396, at the moment Officer Rogers applied the "half spear." We reach this conclusion even accepting, for the sake of argument, that Officer Rogers might reasonably have feared Hanks had a concealed weapon.[4]

The recording shows that for approximately the last thirty seconds before the blow—more than half of the total time between when Hanks exited his vehicle and when Officer Rogers took him to the ground—Hanks stood facing away from Officer Rogers. Throughout that time, Hanks displayed his empty hands on the trunk of his car, on the back of his head, and then behind his back. During those last thirty seconds, Officer Rogers kept his taser at the ready, trained on Hanks' back. Hanks's resistance "was, at most, passive," *Deville*, 567 F.3d at 167, and consisted chiefly of remaining on his feet for about twenty seconds after Officer Rogers' first order to kneel, during which time Hanks twice asked whether he was under arrest. We cannot conclude that a reasonable officer would have, under these circumstances, perceived an "immediate threat" warranting a physical takedown.

### *3. Resistance or evasion*

As just discussed, Hanks displayed, at most, passive resistance and made no attempt to flee. In the moment before Officer Rogers administered the

---

[4] Officer Rogers later stated that he "intended to perform a *Terry* frisk for weapons," and Hanks briefly placed a hand into his pants pocket while walking to the back of his car.

"half spear," the recording shows that Hanks took a small lateral step with his left foot. It is not clear from the recording whether Officer Rogers rushed towards and made contact with Hanks in response to, or merely simultaneously with, Hanks's lateral step. It is clear, however, that Hanks's step was not accompanied by any obvious signs of violence or flight: Hanks did not turn his body or move his hands, which remained folded behind his back and plainly visible to Officer Rogers. Under the circumstances reflected in the recording, we cannot conclude that a reasonable officer would have perceived active resistance or an attempt to flee.

Having considered the *Graham* factors, as instructed by *Deville*, 567 F.3d at 167, we conclude that Officer Rogers applied clearly excessive and unreasonable force when he employed the "half spear" takedown against Hanks.

*          *          *

In sum, we hold that Hanks adequately pled a constitutional violation and has offered sufficient evidence to survive summary judgment.

## II.  Clearly established law

Because we conclude Hanks has sufficiently alleged an excessive force claim, we next consider "whether [Officer Rogers's] use of force, though a violation of the Fourth Amendment, was nevertheless objectively reasonable in light of clearly established law at the time the challenged conduct occurred." *See Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008). "Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 137 S.Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015)). A right may be clearly established without "a case directly on point," but "existing precedent must have placed the statutory or

No. 15-11295

constitutional question beyond debate." *See id.* (quoting *Mullenix*, 136 S.Ct. at 308).

"[C]learly established law must be 'particularized' to the facts of the case," *id.* at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)), and "should not be defined 'at a high level of generality,'" *id.* (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011)). In other words, outside of "an obvious case," the law is only "clearly established" if a prior case exists "where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Id.* In "an obvious case," *Graham* and *Garner*[5] may supply the "clearly established law." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (*per curiam*)); *see also Cooper*, 844 F.3d at 524.

In this case, we conclude that on the night Officer Rogers stopped Hanks, clearly established law demonstrated that an officer violates the Fourth Amendment if he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance, and whom the officer stopped for a minor traffic violation. *See Deville*, 567 F.3d at 167–69 (finding qualified immunity inappropriate where, taking the facts in the light most favorable to the plaintiff, an officer making a minor traffic stop overpowered an individual who displayed, at most, passive resistance, and presented no safety threat or flight risk); *see also Doss v. Helpenstell*, 626 Fed. App'x 453, 459–60 (5th Cir. 2015) (unpublished) (construing *Deville* as clearly establishing that an officer should receive no qualified immunity if he "quickly escalate[s]" an encounter with a non-threatening, passively-resisting driver who posed little risk of escape by employing overwhelming force "rather than continu[ing] to negotiate"); *Brothers v. Zoss*, 837 F.3d 513, 520 (5th Cir. 2016)

---

[5] *Tennessee v. Garner*, 471 U.S. 1 (1985).

12

("In denying qualified immunity, we have placed weight on the quickness with which law enforcement personnel have escalated from negotiation to force.") (citing *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012) and *Deville*, 567 F.3d at 167–68). This is, moreover, an "obvious case" in which the *Graham*'s standards independently and clearly establish the basis for our decision.

**A. Prior cases clearly established the contours of the right at issue**

"Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396 (1989). But even an officer who may lawfully use or threaten force must appropriately calibrate the amount of force he employs to the need for force he confronts. *See Deville*, 567 F.3d at 167.

Officer Rogers faced an individual who, at times, did not immediately comply with instructions. "Officers may consider a suspect's refusal to comply with instructions during a traffic stop in assessing whether physical force is needed to effectuate the suspect's compliance." *Id.* (citations omitted). "However, officers must assess not only the need for force, but also 'the relationship between the need and the amount of force used.'" *Id.* (quoting *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir.1999)). Where, as here, an individual stopped for a minor traffic offense offers, at most, passive resistance[6] and presents no threat or flight risk, abrupt application of physical force rather than continued verbal negotiating (which may include threats of force) is clearly unreasonable and excessive. *See Deville*, 567 F.3d at 167–69.

In *Deville*, for example, the facts, taken in the manner most favorable to the plaintiff, showed: (1) the plaintiff was "stopped for a minor traffic

---

[6] As previously noted, the Grand Prairie Police Department's investigation viewed Hanks as a "compliant subject."

violation—exceeding the 40 mph speed limit by 10 mph . . .;" (2) the plaintiff showed no signs of flight or threat, despite still sitting behind the wheel of a vehicle; and (3) the plaintiff's "resistance was, at most, passive in that she merely refused to leave her grandchild and exit the vehicle until [her husband] came to get the child." *Id.* at 167. We identified sufficient evidence in the plaintiff's deposition testimony from which "[a] reasonable jury could infer . . . that [the officer] engaged in very little, if any, negotiation with [the plaintiff]— and find that he instead quickly resorted to breaking her driver's side window and dragging her out of the vehicle." *Id.* at 168. Both parties' experts agreed "that continued negotiations are more appropriate than actual force where the suspect is only stopped for a minor traffic offense and is making no attempt to flee." *Id.*

Similarly, in this case, Officer Rogers stopped Hanks for a minor traffic violation (driving 20 miles per hour under the speed limit), the recording does not suggest that Hanks posed a threat or flight risk, and Hanks's resistance to instructions was, at most, passive. By actually exiting his car, Hanks offered more compliance than the *Deville* plaintiff. He also lowered the risk that he might flee in the vehicle or produce a concealed weapon from within it.[7] For the last thirty seconds before Officer Rogers administered the "half spear," Hanks stood facing away from Officer Rogers, presenting his empty hands on the trunk of his car, the back of his head, and finally behind his back. Officer Rogers kept his taser at the ready and trained on Hanks's back the entire time. Under such circumstances, which favor the plaintiff even more than those presented in *Deville*, our case law clearly establishes that Officer Rogers should

---

[7] A vehicle may be a means of flight, *see, e.g.*, *Scott v. Harris*, 550 U.S. 372, 374 (2007), a weapon, *see, e.g.*, *Brothers v. Zoss*, 837 F.3d 513, 519 (5th Cir. 2016) ("A motor vehicle can be used as a dangerous weapon. . . ."), or may conceal weapons, *see id.* ("[A] reasonable officer could have feared that [the arrestee] might have a weapon . . . in the pickup.").

14

have continued to verbally negotiate—including by threatening force, if necessary—rather than abruptly resorting to "actual" physical force.[8] *See Deville*, 467 F.3d at 168.

Our decision in *Poole* is not to the contrary. The *Poole* majority stated that the plaintiff had "in response to [one officer's] command to turn around and [a second officer's] attempt to handcuff him, back[ed] away from the officers and then actively resist[ed] their efforts to turn him around." 691 F.3d at 631 (5th Cir. 2012). Hanks presented his hands behind his back, did not move away from Officer Rogers, and offered no active physical resistance even after Officer Rogers applied the "half spear." The *Poole* majority concluded that the officers responded with "'measured and ascending' actions that corresponded to [the plaintiff's] escalating verbal and physical resistance." *Id.* at 629 (quoting *Galvan v. City of San Antonio*, 435 Fed. App'x 309, 311 (5th Cir.2010)). Officer Rogers, in contrast, escalated his actions at a point where Hanks's verbal and passive physical resistance was on the decline.[9]

---

[8] Officer Rogers escalated this encounter from his first verbal command to kneel to the application of overwhelming physical force in the space of just twenty seconds. During those twenty seconds, Hanks twice asked, to no avail, whether he was under arrest. The fact that our law clearly establishes the unreasonableness of such a sudden escalation does not, of course, suggest that police may never employ some degree of force against a nonthreatening, passively-resisting individual who presents no flight risk. This case merely requires us to recognize that if police cannot abruptly resort to actual force where such an individual has refused instructions to exit her vehicle for a long enough period of time for the officer who initiated the traffic stop to call for and obtain backup, *see Deville*, 567 F.3d at 161–62, Officer Rogers could not suddenly deploy actual force in response to Hanks's briefer reluctance to kneel.

[9] Immediately before Officer Rogers produced a taser, Hanks was leaning back against the trunk of his car with his hands near his pockets, despite Officer Rogers's repeated commands for Hanks to place his hands on the car. After Officer Rogers produced the taser, Hanks complied with the instruction. Seconds later, Hanks complied with Officer Rogers's directive to place his hands behind his head. When Officer Rogers told Hanks to "go to [his] knees," Hanks folded his hands behind his back (Officer Rogers stood behind Hanks) and asked whether he was under arrest. Though Hanks did not immediately drop to his knees, the recording shows that Hanks had assumed a more compliant, unthreatening position than had been displayed before Officer Rogers produced his taser.

No. 15-11295

**B. *Graham* clearly establishes the violation in this obvious case**

Though we conclude *Deville* clearly proscribed Officer Rogers's actions, we also view this as an "obvious" instance of excessive force in light of the factors set forth in *Graham*. *Graham* directs us to consider the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Cooper*, 844 F.3d at 522 (quoting *Graham*, 490 U.S. at 396). As noted above, all of these factors strongly favor Hanks. No reasonable officer who is aiming a taser at the back of an individual such as Hanks—i.e., an individual who (1) was stopped for a minor traffic violation; (2) exited his car and has his hands displayed behind his back, thus presenting no immediate threat or flight risk; and (3) has displayed, at most, passive resistance, including asking whether he was under arrest—would escalate the situation via a physical takedown only seconds after ordering that individual to kneel.[10]

\*        \*        \*

We hold that on Feb. 26, 2013, clearly established law demonstrated, and *Graham* makes obvious, that it was clearly unreasonable and excessive for Officer Rogers to abruptly escalate the encounter via a physical takedown where (1) Officer Rogers stopped Hanks for a minor traffic offense; (2) immediately before the takedown, Officer Rogers had his taser aimed at Hanks's back while Hanks stood against his vehicle, facing away from Officer Rogers, with his empty hands displayed behind his back, presenting no

---

[10] Officer Rogers notes that the record contains a letter from a Grand Prairie personnel and training officer that states Officer Rogers "would have been ok with a Taser Deployment" during the encounter. That letter does not trump our analysis of the objective reasonableness of Officer Roger's actions for the same reasons that the district court correctly acknowledged its prerogative to reject the Grand Prairie Police Department's conclusion that Officer Rogers's use of force was "not objectively reasonable."

16

immediate threat or flight risk; and (3) Hanks offered, at most, passive resistance, including asking whether he was under arrest.

## CONCLUSION

Accordingly, we REVERSE and REMAND to the district court for further proceedings consistent with this opinion.

17