# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 21, 2022

Lyle W. Cayce
Clerk

No. 21-20256

Jessica Lorraine Solis,

*Plaintiff—Appellee*,

*versus*

Samuel A. Serrett; Teddy F. Sims,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:19-CV-4865

Before Davis, Smith, and Engelhardt, *Circuit Judges*.
Kurt D. Engelhardt, *Circuit Judge*:

Foundational to our qualified immunity doctrine is the concept that we must view an officer's actions from that officer's point of view without the benefit of hindsight. From the comfort of a courtroom or chambers, it is often possible for judges to muse on how an officer could have handled a situation better. But that does not mean the officer is not entitled to qualified immunity. In this case, we cannot say that the officers violated clearly established law when we view the events from the officers' point of view at the very moment they acted. Accordingly, we reverse and remand.

No. 21-20256

## I.

On May 27, 2019, Officer Samuel Serrett pulled over Timothy Robinson and his girlfriend Jessica Solis in Baytown, Texas near a self-storage center.[1]  Serrett told Robinson, the driver, that he had been pulled over for failing to properly signal and driving outside of his lane.  Serrett posed a series of questions to Robinson, but Solis interjected and answered the questions before Robinson could respond.  Eventually, Serrett had to clarify to Solis that unless he was directing a question specifically to her, he wanted a response from Robinson as he was the driver.  Serrett requested Robinson's license and registration.  Solis informed Officer Serrett that she owned the vehicle.  The couple further informed Serrett that they lived in an apartment unit in the storage unit building across the street.  Because Serrett believed that either Robinson or Solis (or both) may have been intoxicated, he requested the assistance of a backup officer.

Serrett ordered Robinson to exit the vehicle.  Serrett then asked Robinson a variety of questions, and the exchange became tense.  Eventually, Serrett began a field sobriety test of Robinson.  Robinson objected, stating "I am not intoxicated."  Serrett viewed this as refusing the field sobriety test. He arrested Robinson and placed him into the police vehicle.

When Serrett asked Robinson to exit the vehicle, Solis began

---

[1] The incidents described here were captured, at least in part, on four videos. These videos are available at:

https://www.ca5.uscourts.gov/opinions/pub/21/21-20256_Body_Cam.mp4

https://www.ca5.uscourts.gov/opinions/pub/21/21-20256_Dash_Cam.mp4

https://www.ca5.uscourts.gov/opinions/pub/21/21-20256_Plaintiff_Recording.mp4

https://www.ca5.uscourts.gov/opinions/pub/21/21-20256_Storage_Facility_Video.mp4

recording the encounter on her cell phone and stepped out of the vehicle herself. Shortly afterward, Officer Teddy Sims arrived on the scene and asked Solis to step over to a grassy area near the storage facility. While Serrett and Robinson spoke, Solis spoke with Sims. Sims asked Solis how much she had to drink that evening, and Solis responded, "literally none." This was false, as Solis later testified in her deposition that she had been drinking. Solis also emphasized that she did "not appreciate this" and stated repeatedly that the couple was pulled over only when her "black boyfriend is driving [her] car."

When Serrett arrested Robinson for refusing the field sobriety test, Solis objected, and Sims informed her that Robinson "refused, so he's taking him in." Solis stepped closer to Serrett and Robinson, and Sims asked her to step back to the grassy area because he did not "want to put [Solis] in cuffs for interference." Solis began to narrate the events, and Sims interjected stating "well actually, he gave him multiple opportunities, I'm gonna say it for the camera . . . multiple opportunities, and he refused."

Once Robinson was in Serrett's vehicle, Serrett walked over to where Solis and Sims stood. Serrett informed Sims that Robinson's license was "ineligible." Sims responded, "Oh that's why they were acting like that." At this point, Solis stopped filming but continued to hold her cell phone. She twice requested Serrett's badge number. Serrett reached out and said, "Can I see your phone for a second please?" Solis jerked the phone away from Serrett's hand and responded, "No you can't." Serrett continued to reach for the phone stating, "Well I don't want you to drop it when I arrest you." Solis let her left hand fall to her side and exclaimed, "Drop it? Excuse me!" Sims came up behind Solis and quickly pulled her left arm behind her back. Serrett reached for Solis's other arm. Solis fell to the ground, either from the officers forcing her down or from the momentum as she struggled. Sims then held his knee on Solis's back as Serrett handcuffed her. Officer Serrett

informed Solis that she was being arrested for public intoxication, stood her up, and walked her over to the police car.  Serrett took Solis and Robinson to jail.

Solis sued Serrett and Sims, asserting various § 1983 claims including excessive force, unreasonable seizure due to an arrest without probable cause, malicious prosecution, violation of her First Amendment rights for arresting her in retaliation for filming the officers, and violation of her Fourteenth Amendment rights.  Serrett and Sims answered and asserted the defense of qualified immunity.

The officers later moved for summary judgment, arguing they were entitled to qualified immunity on all of Solis's claims.  The district court granted summary judgment on all of Solis's claims except her excessive force § 1983 claim.[2]  The district court held that disputed issues of material fact barred summary judgment on the excessive force claim and that, viewing the facts in Solis's favor, the officers violated a clearly established right.  Serrett and Sims promptly appealed.

## II.

"Qualified immunity shields public officials sued in their individual capacities from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kokesh v. Curlee*, 14 F.4th 382, 391 (5th Cir. 2021) (cleaned up).  "This court reviews de novo the district court's resolution of legal issues on a motion for summary judgment on the basis of qualified immunity." *Hanks v. Rogers*, 853 F.3d 738, 743 (5th Cir. 2017) (quoting *Griggs v. Brewer*, 841 F.3d 308, 311 (5th Cir. 2016)).  "Summary

---

[2] The dismissal of Solis's other claims is not the subject of this appeal.

judgment must be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trammell v. Fruge*, 868 F.3d 332, 338 (5th Cir. 2017) (quoting FED. R. CIV. P. 56(a)). "In reviewing an appeal from summary judgment, we 'view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.'" *Hanks*, 853 F.3d at 743 (quoting *Deville v. Marcantel*, 567 F.3d 156, 163–64 (5th Cir. 2009)). "A qualified immunity defense alters the usual summary judgment burden of proof. Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.* at 744 (quoting *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)).

Importantly, appellate review of an interlocutory appeal is circumscribed. "District court orders denying summary judgment on the basis of qualified immunity are immediately appealable and reviewed *de novo* only if they are predicated on conclusions of law and not genuine issues of material fact." *Kokesh*, 14 F.4th at 390. Put another way, "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995). "But we do have jurisdiction to decide whether the district court erred in concluding as a matter of law that officials are not entitled to qualified immunity on a given set of facts. In other words, this court can review whether any factual dispute found by the district court is material for summary judgment purposes." *Whittington v. Maxwell*, 455 F. App'x 450, 454 (5th Cir. 2011) (cleaned up). Accordingly, "[t]his Court is essentially reviewing the district court's decision that a 'certain course of conduct would, as a matter of law, be objectively unreasonable in light of

clearly established law.'" *Kokesh*, 14 F.4th at 391 (quoting *Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc)). "To make this determination, the court applies an objective standard based on the viewpoint of a reasonable official in light of the information then available to the defendant and the law that was clearly established at the time of the defendant's actions." *Id.* (quoting *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007)).[3]

## III.

"The qualified immunity inquiry includes two parts. In the first we ask whether the officer's alleged conduct has violated a federal right; in the second we ask whether the right in question was 'clearly established' at the time of the alleged violation, such that the officer was on notice of the unlawfulness of his or her conduct." *Cole v. Carson*, 935 F.3d 444, 451 (5th Cir. 2019) (en banc). The court need not decide the first question before the second, and it may decide the case solely on the basis that the right was not clearly established. *Pearson v. Callahan*, 555 U.S. 223, 236–37 (2009). We address each question in turn.

### A.    Constitutional Violation

Solis's sole outstanding § 1983 claim is one for excessive force under the Fourth Amendment. "To establish a claim of excessive force under the Fourth Amendment, plaintiffs must demonstrate: '(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Trammell*, 868 F.3d at 340 (quoting *Deville*, 567 F.3d at 167). At bottom, "the touchstone of

---

[3] Notably, although our review is circumscribed as described above, we do have jurisdiction. The court may look at the evidence in the light most favorable to Solis and determine if the district court erred in finding that evidence established a constitutional violation under clearly established law. Solis's motion to dismiss this appeal for lack of jurisdiction, which was carried with the case, is therefore denied.

our inquiry is simply the reasonableness of the force employed." *Buehler v. Dear*, 27 F.4th 969, 981 (5th Cir. 2022). "Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Deville*, 567 F.3d at 167 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). We examine each officer's actions independently to determine whether he is entitled to qualified immunity. *Meadours v. Ermel*, 483 F.3d 417, 421–22 (5th Cir. 2007).

We first consider Solis's injury. At her deposition, Solis testified that her back and her wrists were hurt and that she still has problems with her right wrist, which she said "feels like a nerve thing" and described as "a pulled pain." Solis also claims that she suffered mental anguish because of the officers' actions.

Generally, to maintain a claim for excessive force, a plaintiff need not demonstrate a significant injury, but the injury must be more than *de minimis*. *See Tarver v. City of Edna*, 410 F.3d 745, 752 (5th Cir. 2005). Recently, this circuit has characterized the injury requirement as "a sliding scale, not a hard cutoff." *Buehler*, 27 F.4th at 982. This approach treats the degree of injury—even if minor—as interrelated to the reasonableness and excessiveness of the officer's force. "[A]lthough a *de minimis* injury is not cognizable, the extent of injury necessary to satisfy the injury requirement is 'directly related to the amount of force that is constitutionally permissible under the circumstances.'" *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017) (alternation in original) (quoting *Brown v. Lynch*, 524 F. App'x 67, 79 (5th Cir. 2013)). Accordingly, "[a]ny force found to be objectively unreasonable necessarily exceeds the *de minimis* threshold, and, conversely, objectively reasonable force will result in *de minimis* injuries only." *Id.* (quoting *Brown*, 524 F. App'x at 79). In other words, "as long as a plaintiff has suffered 'some injury,' even relatively insignificant injuries and purely

psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force." *Id.* (quoting *Brown*, 524 F. App'x at 79). This means that if the officer's force was unreasonably excessive, Solis need only show "some injury"—a bar which she clears here.

Solis's injuries are properly characterized as minor. Courts have found similar or worse injuries to be minor. *See, e.g.*, *Westfall v. Luna*, 903 F.3d 534, 549–50 (5th Cir. 2018) (holding that abrasions, bruises, bloody urine and high blood pressure were *de minimis* injuries); *Buehler*, 27 F.4th at 982 (holding that abrasions to the face, head and tricep bruises, and mental trauma were minor injuries). Moreover, Solis never sought medical treatment. *See Buehler*, 27 F.4th at 983 (noting that a plaintiff's failure to seek medical treatment suggested the injury was minor). Nor do we place much weight on Solis's supposed psychological injury, as "we have rejected similar attempts by excessive-force plaintiffs to parlay their minimal injuries into more serious ones by tacking on allegations of psychological suffering." *Id.* Accordingly, the limited extent of Solis's injuries tends to support a conclusion that the officers acted reasonably.

We next consider the amount of force used and the reasonableness of resorting to such force. Courts generally consider these factors together, as "officers must assess not only the need for force, but also 'the relationship between the need and the amount of force used.'" *Deville*, 567 F.3d at 167 (quoting *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999)). In *Graham v. Connor*, the Supreme Court enumerated three non-exclusive considerations for courts to examine when analyzing the reasonableness of the force used, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396.

No. 21-20256

The severity of the crime at issue here weighs against the officers. Robinson, not Solis, was pulled over for a traffic violation. *See Newman v. Guedry*, 703 F.3d 757, 762 (5th Cir. 2012). The officers ultimately arrested Solis for public intoxication, a Class C misdemeanor in Texas. Tex. Penal Code § 49.02(c); *see also Trammell*, 868 F.3d at 340 (holding that public intoxication in Texas is a "minor offense" for the purposes of the *Graham* factors). Indeed, the officers do not dispute this factor. We next consider whether Solis posed an immediate threat to the safety of the officers or others. Solis, who was wearing an evening dress with laced sandals and armed only with her cell phone, did not pose an immediate threat to the safety of the officers or others. This factor therefore also weighs against the officers.

The third factor—whether Solis was resisting arrest—cuts in favor of the officers. Case law distinguishes between active and passive resistance. "[W]here an individual's conduct amounts to mere 'passive resistance,' use of force is not justified." *Trammell*, 868 F.3d at 341. Here, Solis was generally hostile to the officers from the beginning of the traffic stop. She emphasized that she and Robinson were near their home, argued with the officers, repeatedly implied that Robinson was pulled over only because of his race, pulled away when Serrett asked for her phone, and stepped back and exclaimed "Drop it? Excuse me!" when Serrett told her she was being arrested. This court has also acknowledged that "a suspect who backs away from the arresting officers is actively resisting arrest—albeit mildly." *Buehler*, 27 F.4th at 984 (cleaned up). Solis also seemed to struggle against the officers as they grabbed her arms, which viewed from the officers' perspective could be "another form of resistance." *Id.* Accordingly, it may have been reasonable for the officers to perceive Solis as actively resisting arrest, and this factor weighs in the officers' favor.

Although not listed in the *Graham* factors, courts also consider the speed with which officers resort to force. *See, e.g.*, *Trammell*, 868 F.3d at 342

9

("[T]he quickness with which the officers resorted to tackling Trammel [sic] to the ground militates against a finding of reasonableness."). This is because "an officer must use force with measured and ascending actions that correspond to a suspect's escalating verbal and physical resistance." *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 332–33 (5th Cir. 2020) (cleaned up). Here, Sims grabbed Solis's arm seconds after Serrett told her that she would be arrested, and Serrett joined him immediately after. However, we are mindful that the "focus is on the officers' reasonable perception of the events at issue, as they happened, *without* the aid of hindsight." *Tucker v. City of Shreveport*, 998 F.3d 165, 176 (5th Cir. 2021). Solis's adverse course of conduct leading up to the arrest—including indignant remarks, asking for Serrett's badge number, refusing to provide him her phone, and stepping back—may have indicated to the officers that she would not submit to arrest. Indeed, such a belief would be well-founded. Solis confirmed in her deposition that she would not have submitted to arrest unless the officers explained to her why was being arrested. Accordingly, to the extent this factor tilts against the officers, it does so only slightly.

Taking these considerations together, we conclude that the actions of Serrett and Sims were not so objectively unreasonable as to violate Solis's constitutional rights. First, Solis's essentially *de minimis* injuries weigh strongly in favor of a finding of qualified immunity. Second, while two of the *Graham* factors weigh against the officers, qualified immunity can apply even when only one factor weighs against the plaintiff. *See Betts v. Brennan*, 22 F.4th 577, 582 (5th Cir. 2022). And we have held that the two *Graham* factors that favor Solis "are less salient." *Id.* Moreover, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Buehler*, 27 F.4th at 981 (quoting *Graham*, 490 U.S. at 396–97). The use of force demonstrated on the video evidence was relatively limited, involving only the officers'

restraint of Solis's arms, a brief takedown, the force necessary to restrict her while she was handcuffed, and she was promptly brought to her feet. Finally, as we have stressed, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. It was reasonable of Sims and Serrett to believe that, in light of Solis's interjections, her comments toward them, her resistance, and her indignation on being told she would be arrested, *some* degree of force would be necessary to subdue her. In sum, even viewing the facts in the light most favorable to Solis, we cannot say that the officers violated her constitutional right to be free from excessive force. Accordingly, we conclude that the district court erred in denying the officers' motion for summary judgment.

## B.    Clearly Established

We further hold that even had Serrett and Sims violated Solis's constitutional rights, such a right was not clearly established at the time of the supposed constitutional violation.[4] To determine that a right is clearly established "we must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc) (cleaned up). "Although this does not mean that 'a case directly on point' is required, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Trammell*, 868 F.3d at 339 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741

---

[4] Appellee briefly states that the Fifth Circuit should reconsider its jurisprudence on what constitutes "clearly established law." This argument is meritless as the panel is bound by the rule of orderliness. *See, e.g.*, *United States v. Traxler*, 764 F.3d 486, 489 (5th Cir. 2014).

(2011)).[5]   The precedent must also be at "a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful." *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015).

The most similar Fifth Circuit cases that Solis cites are *Trammell v. Fruge*, 868 F.3d 332 (5th Cir. 2017), and *Hanks v. Rogers*, 853 F.3d 738 (5th Cir. 2017), each of which we consider in turn.  *Trammell* was the case that the district court held clearly established that the officers' conduct violated Solis's Fourth Amendment rights.  In that case, George Trammell, the plaintiff, was suspected of driving his motorcycle while intoxicated. *Trammell*, 868 F.3d at 336.  Four officers, including Officer Fruge, arrived on the scene and asked Trammell a series of questions. *Id.* at 336–37.  Trammell calmly refused to tell Fruge how much he had been drinking, declined to walk toward Fruge, and refused to put his hands above his head. *Id.* at 337.  He also told Fruge "I'm not going to jail." *Id.*

Fruge then grabbed Trammell's right arm. *Id.*  Trammell pulled back and told Fruge that it hurt and not to grab him there. *Id.*  Another officer grabbed Trammel's left arm, but Trammell pulled away. *Id.*  Fruge then performed a knee strike on Trammell's thighs, and another officer put Trammell in a headlock. *Id.*  Three officers pulled Trammell to the ground, where his face landed on the pavement. *Id.*  While Trammell was on the ground, the officers administered knee strikes to Trammell's arms, thighs, and ribs to subdue him. *Id.* at 337–38.  Trammell was eventually diagnosed with "mildly displaced right L1, L2, and L3 transverse process fractures." *Id.* at 338.  He was forced to give up recreational activities and claimed he had

---

[5] The law does not always require an on-point authority: if an officer commits a patently obvious violation of the Constitution, he is not entitled to qualified immunity. *See Hope v. Pelzer*, 536 U.S. 730, 738–41 (2002).  But this is not an obvious case.

"very limited mobility" as a result of his injuries. *Id.*

The court analyzed the *Graham* factors and held either that they all weighed against the officers or that disputed issues of material fact existed. Specifically, it found that: (1) Trammell's offense was minor; (2) a fact question existed as to whether Trammell posed a threat to himself or others; (3) a fact question existed as to whether Trammell was actively resisting; and (4) the quickness with which the officers resorted to force weighed against finding the officers' actions reasonable. *Id.* at 340–42. Importantly, the court also held that "Trammell has independently presented a question of material fact as to whether the force used to gain control of his arms was excessive to the need." *Id.* at 342. The court emphasized the harsh nature of the officers' actions and the degree of force used. *Id.*

The degree of force used sets *Trammell* apart from the case at hand. Unlike here, three officers "tackled" Trammell to the ground, where he landed face first on pavement. *Id.* at 337–38. They "pummeled" him with their knees and fists. *Id.* at 342. They did so after Trammell shouted that his arm was fused. *Id.* The court held that "a jury could reasonably infer that the officers heard Trammel's plea but nevertheless continued to beat him without consideration for his limited mobility and strength." *Id.* And unlike Solis's minor injuries, Trammell incurred bone fractures that significantly affected his life. *Id.* at 338. In short, the use of force in *Trammell* was clearly disproportionate to the need for it. Accordingly, no officer reading that case would reasonably understand it to govern here, where the officers only yanked Solis's arms behind her back and—at most—briefly pulled her to the ground.

*Hanks* involved a similar factual scenario that is also distinguishable. In that case, Marcus Hanks was pulled over by Officer Randall Rogers for driving too slowly. *Hanks*, 853 F.3d at 741. Rogers asked Hanks to exit the

vehicle and step to the back. *Id.* at 741–72. Rogers gave Hanks additional orders, including to keep his hands out of his pockets, to place his hands on the vehicle, and then to place his hands on his head. *Id.* at 42. Although Hanks at times questioned why he was being asked to do so, he complied with the officer's orders. *Id.* During these exchanges, Rogers's pulled out a taser and trained it on Hanks. *Id.* Rogers then asked Hanks to go to his knees. *Id.* Hanks did not immediately comply, and Rogers repeated his request. *Id.* Hanks, with his hands still behind his head and with Rogers taser still aimed at him, took a small sidestep. *Id.* Simultaneously with this step, Rogers rushed forward and "administered a blow to Hanks's upper back or neck," which "forced Hanks's upper body onto the trunk of his vehicle." *Id.* at 743. "Rogers maintained contact with Hanks as Hanks shifted onto the ground. Once on the ground, Hanks laid face-down and placed his hands behind his back." *Id.* He was arrested. *Id.* He later sought medical care, and was diagnosed with a contusion, strain, and acute myofascial strain. *Id.* He later claimed the blow caused him continuous pain in his upper back, neck, head, and ribs, as well as psychological fear. *Id.*

The court analyzed the *Graham* factors and, as in *Trammell*, found that (1) Hanks's violation was minor; (2) Hanks offered no immediate safety threat; (3) Hanks was at most passively resisting; and (4) Rogers "abrupt application of physical force rather than continued verbal negotiating" was unreasonable. *Id.* at 745–49. But again, the court noted the extreme degree of physical force used. *See id.* at 747 (finding a Fourth Amendment violation when the officer resorts to "overwhelming physical force" rather than continuing verbal negotiations).

As with *Trammell*, the degree of force Rogers used under the circumstances sets *Hanks* apart from this case. Rather than just grabbing the plaintiff's arms, Rogers "administered a blow to Hanks's upper back or neck" which forced his body down and which caused a contusion and an

acute myofascial strain.  Rogers did this while pointing a taser at Hanks, who had largely complied with his orders.  This differs in kind from a brief struggle that yielded "a nerve thing" for which Solis tellingly never sought treatment.  Accordingly, *Hanks* would not make Sims or Serrett aware that their actions could give rise to an excessive force claim.

The remaining cases cited by the district court and Solis are even further afield from the facts here.  In *Deville v. Marcantel*, an officer pulled over a 45-year-old nurse for speeding.  567 F.3d 156, 161 (5th Cir. 2009).  In response to her passive resistance, the officers broke her window, pulled her out of her car, and threw her up against the vehicle, resulting in a blow to her abdominal area.  *Id.* at 162.  The next day, the plaintiff visited a doctor who observed "contusions to both wrists, neuropathy of her hands, right shoulder strain, left shoulder bruising (with handprints), and multiple cuts caused by broken glass (with one to her forehead)."  *Id.*  The plaintiff required four surgeries and missed thirteen to fifteen weeks of work as a result of her injuries.  *Id.*  As with the cases discussed above, the court discussed the *Graham* factors and reasoned they favored a finding the police acted unreasonably and took issue with the fact the officers engaged in "little, if any negotiation" with the plaintiff before resorting to force.  *Id.* at 167–68.  But the court also focused on the "the severity of Deville's injuries" in determining whether there was excessive force under these circumstances.  *Id.* at 168.  Finding that the "facts [were] sufficiently egregious," the court denied qualified immunity.  *Id.* at 169.  As above, although there are parallels to the instant case, *Deville* dealt with a use of force and an injury far greater than here.

Similarly, *Newman v. Guedry* was a traffic-stop case where all of the *Graham* factors weighed against the officers and the court expressed a concern about how quickly the officers resorted to force.  703 F.3d 757, 762–63 (5th Cir. 2012).  In that case, in response to a plaintiff's passive resistance,

officers struck the plaintiff with a baton thirteen times and tased him three times. *Id.* at 760. Again, the degree of force in that case was significantly greater than that here and was obviously disproportionate to the plaintiff's actions. Likewise, in *Goodson v. City of Corpus Christi*, two officers tackled a plaintiff to the ground, broke his shoulder, jerked his arm back, and cuffed him even after he complained his arm was broken. 202 F.3d 730, 734 (5th Cir. 2000). The plaintiff spent eight days in the hospital and needed a plate and screws implanted. *Id.* Further, the plaintiff's retelling of the incident indicated he complied completely with the officers' orders. *Id.* at 733–34. Accordingly, the degree of force and injury in *Goodson* is readily distinguishable from the facts here.

Finally, Solis argues that *Joseph ex rel. Estate of Joseph v. Bartlett* supports her argument that the officers violated a clearly established right. 981 F.3d 319 (5th Cir. 2020). That case (which was issued over a year after the incident at issue here), involved police officers beating and tasing a schizophrenic man to death while he was on the ground, not resisting, and calling out for his mother. *Id.* at 326–27. *Joseph*'s facts are so far afield from the instant case that even were it published before May 2019, it could not establish that the Appellants' actions here were unconstitutional.

Since May 2019, we have decided numerous cases with facts even more like this case than *Trammell* or *Hanks*, and we have repeatedly found no constitutional violation. Consider *Tucker v. City of Shreveport*, which dealt with a plaintiff who was pulled over for a broken brake light. 998 F.3d 165. An officer asked him to come to the back of the car, where he searched him and found a small knife. *See Tucker v. City of Shreveport*, No. 17-1485, 2019 WL 961993, at *1 (W.D. La. Feb. 27, 2019). Although the plaintiff was agitated, he was compliant. *Id.* He was never told that he was under arrest. *Id.* The plaintiff denied that he ever pulled away from the officers, but they claimed that he jerked his arm when they tried to arrest him, and the video

evidence showed his arm moving. *Tucker*, 998 F.3d at 178. The officers performed a takedown and brought the plaintiff to the ground. *Id.* at 175. He sued, and the district court denied qualified immunity to the officers. After an exhaustive review of the evidence and an emphasis on viewing the events from the point of view of the officers at the time, the Fifth Circuit reversed, finding no constitutional violation and that the law was not clearly established. *Id.* at 176–81. If there is no constitutional violation where the officers perform a takedown on a mostly compliant plaintiff who was never told he was under arrest and whose form of active resistance was jerking his arm away, it is difficult to say that there was a "clearly established" violation here.

Or consider *Craig v. Martin*, 26 F.4th 699 (5th Cir. 2022). There, Jacqueline Craig called the police after a neighbor grabbed her son's neck for littering. *Id.* at 702. Officer Martin responded, and Craig and Martin had a dispute. *Id.* at 702–03. One of Craig's daughters, J.H., grabbed her mother's arms during the dispute, and Martin pulled her aside. *Id.* at 703. Another of Craig's daughters, K.H., pushed into Martin, and Martin told the family to get on the ground, shoved Craig into the ground, and pulled Craig's arms behind her back. *Id.* Martin handcuffed Craig and walked over to J.H., grabbed her arm and the back of her neck, and put her on the ground. *Id.* When he tried to take Craig and J.H. to his vehicle, K.H. appeared and attempted to block access to the vehicle. *Id.* Martin struck the fourteen-year-old K.H. in the throat. *Id.* He also kicked J.H.'s leg as he placed her in the vehicle. *Id.* Finally, Martin went to arrest another of Craig's daughters, Brea Hymond, who had been filming the altercation. *Id.* Martin handcuffed Hymond and put her against his vehicle. *Id.* When she refused to answer his questions, Martin pulled her arms behind her back to force compliance, a maneuver Hymond claimed caused excruciating pain. *Id.*

This court held that Martin was entitled to qualified immunity.

No. 21-20256

Specifically, it held that Martin did not use excessive force because the plaintiffs' injuries were not significant, and the use of force was proportionate to the need given the resistance that Martin faced throughout the incident. Moreover, the court also found that even had Martin violated a constitutional right, such a right was not clearly established. If there was no constitutional violation on those facts, including the initial takedown of Craig and the compliance maneuver performed on Hymond, it is difficult to see how a clearly established violation could exist here.

Finally, consider *Betts v. Brennan*, 22 F.4th 577 (5th Cir. 2022). In that case, a police officer tased a plaintiff who was highly agitated but had mostly complied with the officer's orders. *Id.* at 580–81. The plaintiff in *Betts* offered more resistance than Solis, but the use of force was also greater. The district court denied qualified immunity but this court reversed, holding that the plaintiff's actions rose to active resistance and that *Hanks* was not sufficiently on-point to illustrate a constitutional violation. *Id.* at 583–86.

Although *Tucker*, *Craig*, and *Betts* were decided after the incident at issue here, they demonstrate that as of May 2019 the constitutional question at issue here was far from "beyond debate." *Trammell*, 868 F.3d at 339. Moreover, it is telling that in none of these cases did the court find a "clearly established" right. If the law was not sufficiently clear to deny qualified immunity in these factual similarly cases, it follows that no "clearly established" right exists here.

## IV.

For the foregoing reasons, we DENY Appellee's motion to dismiss this appeal, REVERSE the district court's order denying Appellant's motion for summary judgment, and REMAND with instructions that Solis's claims against Appellants be dismissed.

18